W<u>m</u> Breck Seiniger, Jr. (ISB#2387)
SEINIGER LAW OFFICES, P.A.
942 Myrtle Street
Boise, Idaho 83702
Voice: (208) 345-1000
Fax:   (208) 345-4700

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT FOR THE STATE OF IDAHO

| | |
|---|---|
| **DANIEL SAVAGE,**<br>    *Plaintiff*<br><br>**v.**<br><br>**Dennis Dillon Auto Park & Truck Center, Inc., Peder Humlen,** individually, **Roy Baxter,** individually, **Lee Hawkins,** individually, and John Does I to XX whose true identities are unknown,<br>    *Defendants* | **Case No.**  1:14-cv-00123<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff, and for causes of action against Defendants, alleges as follows:

### I.   JURISDICTION AND PARTIES

1.      Plaintiff, Daniel Savage ("Plaintiff Savage") was, at all relevant times herein, a resident of Boise, Ada County, Idaho.

2.      Defendant Dennis Dillon Auto Park & Truck Center, Inc.  ("Defendant Dennis Dillon") is a Delaware corporation which maintains a business address of 2777 South Orchard Street, Boise, Idaho 83705 and is a resident of Ada County, Idaho whose registered

**COMPLAINT AND DEMAND FOR JURY TRIAL**
-1-

agent for service of process with the Idaho Secretary of State is Dennis Dillon Auto Park & Truck Center, Inc., Donald J. Farley, 345 Bobwhite Court, Suite 150, Boise, Idaho 83706 and/or 702 West Idaho, Suite 700, Boise, Idaho 83702.

3.       Defendant Dennis Dillon Auto Park & Truck Center, Inc. at all relevant times herein did business in Ada County, State of Idaho under a Certificate of Authority issued by the Idaho Secretary of State.

4.       Upon information and belief, Defendant Peder Humlen ("Defendant Humlen") is a resident of Ada County, Idaho.

5.       Upon information and belief, Defendant Roy Baxter ("Defendant Baxter") is a resident of Ada County, Idaho.

6.       Upon information and belief, Defendant Lee Hawkins ("Defendant Hawkins") is a resident of Ada County, Idaho.

7.       The incidents that are the basis of this case occurred in Ada County.

8.       Defendants John/Jane Does I through X, whose true identities are presently unknown, are entities or individuals who were the agents, employees, independent contractors, subdivisions, or divisions of Defendants herein, or are entities or individuals acting on behalf of, or in concert with, the individual Defendants herein.

**9.**       The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332 because Plaintiff asserts claims arising under Title VII of the Civil Rights Act of 1964 makes it unlawful for "an employer to discriminate against any employee with respect to race." Specifically, Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e–2(a)(1&2) makes it unlawful to:

**COMPLAINT AND DEMAND FOR JURY TRIAL**

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

10.     This Court has jurisdiction authorized by 28 U.S.C. § 1343(a)(3) or by virtue of federal question jurisdiction statute 28 U.S.C. §1331.

11.     Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e–2(a)(1), and defines "employer" as "a person who has fifteen or more employees," §2000e(b). The Act's jurisdictional provision empowers federal courts to adjudicate civil actions "brought under" Title VII. §2000e–5(f)(3). Title VII actions also fit within the Judicial Code's grant of subject-matter jurisdiction to federal courts over actions "arising under" federal law. 28 U. S. C. §1331 and 1343.

12.     Defendant Dennis Dillon, has and had at all relevant times herein more than fifteen employees.

13.     The Court has supplemental jurisdiction over any state law claims because Plaintiff's claims are so related to the claims within the court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

## II.  VENUE

14.     Venue is proper in the Western Division of the District of Idaho because at least one of the Defendants "resides" within Ada County, 28 U.S.C. 1391 (a) and (c). All of

the defendants are subject to personal jurisdiction in Idaho.  28 U.S.C. 1391 (a).

### III.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

15.     Plaintiff has exhausted all of his administrative remedies with respect to his Title VII and Idaho Human Rights Act Claims.

16.     Attached hereto as Exhibit 1 is an authentic copy of the right to sue letter issued by the EEOC.

17.     Attached hereto as Exhibit 2 is an authentic copy of the right to sue letter issued by the Idaho Human Rights Commission.

18.     Attached hereto as Exhibit 3 is an authentic copy of the decision issued by the Idaho Human Rights Commission.

19.     The findings of the Idaho Human Rights Commission have been adopted by the EEOC.

20.     The facts contained in the decision of the Idaho Human Rights Commission, and the allegations of the Plaintiff set forth therein are hereby incorporated herein *in haec verba*.

### IV.   NATURE OF THE CASE

21.     The conduct complained about in this lawsuit involves working under terms and conditions of employment that differed from similarly situated employees, harassment, retaliation, and constructive termination.

### V.   FACTS COMMON TO ALL CAUSES OF ACTION

**Background on Employment**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

22.     Plaintiff Savage is of African-American descent.

23.     Plaintiff Savage's most recent period of employment for Defendant Dennis Dillon, Kia location, as a sales advisor, began in December 2011.

24.     Plaintiff Savage left his employment with Defendant Dennis Dillon, Nissan location, in April 2012.  At that time he was working as a sales advisor.

25.     Defendant Humlen, Defendant Baxter, and Defendant Hawkins were all employed by Defendant Dennis Dillon and were coworkers to Plaintiff Savage.

**Statements Evidencing Racial Hatred Inflicting Emotional Distress**

26.     In December 2011, Defendant Humlen made racially inappropriate comments towards Plaintiff Savage.  Specifically, Defendant Humlen in December 2011 was wearing a cartoon tie. Plaintiff Savage asked what was on his tie, and Defendant Humlen responded, "A spook." Plaintiff Savage asked what Defendant Humlen said, and Defendant Humlen responded, "You heard me; it's a spook just like you."

27.     In December 2011, Defendant Humlen again made racially inappropriate comments toward Plaintiff Savage. Expressly, Defendant Humlen said, "You know, Dan, you're nothing but a mammy." Plaintiff Savage asked Defendant Humlen why he called him another racial name and Defendant Humlen responded, "Because I can."

28.     Plaintiff Savage complained to Defendant Dennis Dillon managers Jason Erickson and Mike Booher in December 2011. Defendant Dennis Dillon managers Erickson and Booher met with Defendant Humlen and Defendant Humlen admitted making the December 2011 racially inappropriate comments. Defendant Dennis Dillon told Plaintiff Savage that Defendant Humlen was "written up."

29.     The comments and conduct of Defendant Humlen was unsolicited, and unwelcome.

30.     In late December 2011 or early January 2012 Defendant Baxter asked Plaintiff Savage, "Hey, Dan, if I throw this banana on the ground, would you pick it up?" Plaintiff Savage told Defendant Baxter that his comment was not funny.

31.     On January 4, 2012 Defendant Baxter was with a customer and Defendant Baxter said, "Hey, Dan, we know that Black is beautiful, but White is superior." Defendant Baxter repeated that same comment to Plaintiff Savage on January 7, 2012.

32.     On January 7, 2012 Defendant Baxter again made racially inappropriate comments to Plaintiff Savage, Defendant Baxter said, "I do not know how Black people sell cars, but we White people sell them this way."

33.     On the evening on January 7, 2012 Defendant Baxter called Plaintiff Savage "boy." Plaintiff Savage protested, Defendant Baxter said, "Listen, boy, I was just playing with you and that is how we talk where I come from."

34.     The comments and conduct of Defendant Baxter was unsolicited, and unwelcome.

35.     On January 7, 2012 Defendant Hawkins in the presence of Plaintiff Savage and other coworker generally asked, "Hey, guys, how come I cannot use the word 'nigger'?"

36.     The comments and conduct of Defendant Hawkins was unsolicited, and unwelcome.

37.     As a direct and proximate result of above acts and statements of the Defendants, Plaintiff Savage suffered severe emotional distress because he felt unsafe and vulnerable in the workplace after learning of Defendant Humlen's comments.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

38.     Subsequently, Plaintiff Savage complained to Defendant Dennis Dillon's management about Defendant Baxter and Defendant Hawkins's conduct. Defendant Dennis Dillon management met with Defendant Baxter, who confirmed he had made the comments.

39.     On or about January 10, 2012 Defendant Humlen stated to coworker Clayton Hall that he (Defendant Humlen) wanted to go back and "kill all the niggers" who worked at Defendant Dennis Dillon. At the time Defendant Humlen made those comments Plaintiff Savage was the only Black employee at Defendant Dennis Dillon in that area.

**Plaintiff's Attempts to Solicit the Help of Management**

40.     On or about January 10, 2012 Plaintiff Savage met with Defendant Dennis Dillon Chief Financial Officer (CFO), Duane Sessions, and Human Resources Officer, Tina Adams, regarding the comments and conduct of Defendant Humlen, Defendant Baxter, and Defendant Hawkins. Plaintiff Savage was told by Defendant Dennis Dillon that an investigation would be conducted.

41.     Later that day, Plaintiff Savage was informed that Defendant Baxter and Defendant Hawkins were "written up" for their comments. Defendant Dennis Dillon did not inform Plaintiff Savage about whether any further action was taken with Defendant Humlen.

42.     Notwithstanding the fact that Plaintiff was the victim of outrageous and discriminatory conduct, Defendant Dennis Dillon did not remove the offending individuals from the workplace.

43.     Rather, Defendant Dennis Dillon suggested that Plaintiff Savage transfer to another dealership.

44.     Following the January 10, 2012 meeting, Defendant Dennis Dillon Human Resources conducted store-wide training on discrimination and harassment.

**Continued Harassment and Defendant Dennis Dillon's Ineffective Response**

45.     In March 2012, Defendant Baxter and Defendant Hawkins made derogatory comments about how "fat and lazy Mexican women are."

46.     After Plaintiff Savage heard these comments he decided to accept Defendant Dennis Dillon's offer to transfer to another dealership.

47.     Plaintiff Savage transferred to Defendant Dennis Dillan's Nissan dealership on March 9, 2012.

48.     On March 13, 2012 Plaintiff Savage was contacted by Steve Hazlett, a friend of his who had worked with Plaintiff Savage and Defendant Humlen at a different dealership.

49.     Mr. Hazlett informed Plaintiff Savage that he applied for a job at Defendant Dennis Dillon's Kia dealership, and while there Mr. Hazlett spoke with Defendant Humlen.

50.     Mr. Hazlett reported that he and Defendant Humlen were talking about Plaintiff Savage leaving the dealership. During that discussion Defendant Humlen told Mr. Hazlett that he does not like "niggers."

51.     Plaintiff Savage continued to suffer severe emotional distress because he felt unsafe and vulnerable in the workplace after learning of Defendant Humlen's comments.

52.     On March 17, 2012, Plaintiff Savage met with Defendant Dennis Dillon's CFO, Duane Sessions and Human Resources Officer, Tina Adams regarding what Mr. Hazlett told Plaintiff Savage.

53.     Later after that meeting Plaintiff Savage was informed that Duane Sessions and Tina Adams met with Defendant Humlen regarding his comments and reviewed Defendant Dennis Dillon's policies.

54.     To Plaintiff Savage's knowledge, no further disciplinary action was taken against Defendant Humlen, despite Defendant Dennis Dillon's previous assurances to Plaintiff Savage that any further race-based conduct by Defendant Humlen would result in his discharge.

55.     Defendant Dennis Dillon failed to take appropriate corrective action with respect to Defendant Humlen, who Plaintiff Savage asserts continued to make derogatory race-based comments.

56.     Changing the location of Plaintiff's employment did not resolve the physical stress and emotional distress caused by the Defendants Acts and Omissions.

57.     Consequently, Plaintiff was required to resign from the employment of Defendant Dennis Dillon because of the injury to his physical and mental health caused by the Defendants' acts and omissions.

**Damages Resulting From Defendants' Acts and Omissions**

58.     Defendant Dennis Dillon's failure to take appropriate action to disciple Defendant Humlen has exacerbated Plaintiff's emotional distress because he felt unsafe and vulnerable in the workplace.

59.     During this period of comments and conduct of the Defendants, Plaintiff Savage was depressed, his work performance declined, he suffered severe psychological, mental, emotional and spiritual damage, and suffered physical manifestations of emotional distress.

60.     One of the physical manifestations of the emotional distress and stress caused by the acts and omissions of the Defendants was that Plaintiff's heart condition was aggravated.

61.     As a result of being transferred to a new location, Plaintiff suffered a loss of income between the date of his transfer and the date of his separation from Defendant Dennis Dillon.

62.     Plaintiff Savage became ill and was having severe chest pains as a result of the Defendants' conduct that he presented himself to a cardiologist for treatment.

63.     Plaintiff has continued to suffer cardiac symptoms associated with the stress and emotional distress caused by the Defendants.

64.     As a result of the conduct of the Defendant, Plaintiff was required to quit his job at Defendant Dennis Dillon.

65.     Plaintiff has continued to suffer psychological, emotional, and physical manifestations and damages as a result of the acts and omissions of the Defendants.

66.     To the extent that any cause of action applicable to the facts of this case or remedy sought by the Plaintiff requires the pleading of any aggravated state of conduct or mind, such as wantonness, recklessness, etc.  Defendants are on notice that Plaintiff hereby includes such allegations.

## FEDERAL CLAIMS
### FIRST CAUSE OF ACTION

67.     All of the foregoing factual allegations are hereby incorporated herein as though fully set forth *in haec verba*.

**COMPLAINT AND DEMAND FOR JURY TRIAL**
**-10-**

**68.**     Plaintiff alleges claims arising under Title VII of the Civil Rights Act of 1964.

**69.**     At all relevant times herein, Defendant Dennis Dillon was an employer within the meaning of this act.

**70.**     At all relevant times herein, Plaintiff was an employee within the meaning of this act.

**71.**     At all relevant times herein, it was unlawful for Defendant Dennis Dillon to discriminate against any employee with respect to race, including the Plaintiff.

**72.**     At all relevant times herein, it was unlawful for Defendant Dennis Dillon to discriminate against Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because of his race.

**73.**     At relevant times herein, Defendant Dennis Dillon discriminated against Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because of his race.

**74.**     At all relevant times herein, it was unlawful for Defendant Dennis Dillon to limit, segregate, or classify his employees, including Plaintiff, in any way which would deprive or tend to deprive him of employment opportunities or otherwise adversely affect his status as an employee, because of his race.

75.     At relevant times herein, Defendant Dennis Dillon limited, segregated, and/or classified Plaintiff so as to deprive or tend to deprive him of employment opportunities and/or or otherwise adversely affect his status as an employee, because of his race.

76.     As a direct and proximate result of Defendant Dennis Dillon's actions, Plaintiff has suffered, and will continue to suffer in the future, pain and suffering and extreme and severe

**COMPLAINT AND DEMAND FOR JURY TRIAL**

mental anguish and emotional distress.  Plaintiff is thereby entitled to general and special, compensatory damages in amounts to be proven at trial.

77.     Defendant Dennis Dillon's conduct, as described herein, was outrageous, malicious and oppressive and done with a conscious disregard of Plaintiff's rights.  The acts and omissions of Defendant Dennis Dillon were performed with the knowledge of their superior bargaining and economic power and dominion over Plaintiff.

78.     The conduct of the Defendant Dennis Dillon, as aforesaid, was intentional, reckless, malicious, outrageous, or otherwise of a character and quality to give rise to a cause of action for the intentional infliction of emotional distress under Idaho law.

79.     Plaintiff suffered severe emotional distress as a result of the conduct of the Defendant Dennis Dillon.

80.     Plaintiff has sustained damages aforesaid.

## STATE TORT CLAIMS

81.     Plaintiff has causes of action arising under the statutory and common laws of the State of Idaho.

82.     Plaintiff alleges herein for the first time a claim under the Idaho Human Rights Act.

83.     Plaintiff has previously alleged state causes of action that are pending in Ada County, Idaho Case No. CV OC 1321598.

84.     Plaintiff requests that this Court consolidate those claims herein.

## SECOND CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

85.    Plaintiff Savage realleges all of the foregoing allegations as though fully set forth *in haec verba*.

86.    In engaging in the conduct referenced herein, Defendants engaged in outrageous conduct not reasonably cognizable under the standards of decent society.

87.    In engaging the conduct referenced in the preceding paragraphs, Defendants caused Plaintiff to suffer severe emotional distress.

88.    Through the outrageous conduct described above, Defendants, and each of them, acted with the intent to cause, or with reckless disregard for the probability of causing, Plaintiff to suffer severe emotional distress.

89.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered, and will continue to suffer in the future, pain and suffering and extreme and severe mental anguish and emotional distress.  Plaintiff is thereby entitled to general and special, compensatory damages in amounts to be proven at trial.

90.    Defendants' conduct, as described herein, was outrageous, malicious and oppressive and done with a conscious disregard of Plaintiff's rights.  The acts and omissions of Defendants were performed with the knowledge of their superior bargaining, economic power and dominion over Plaintiff.

91.    The conduct of the Defendants, as aforesaid, was intentional, reckless, malicious, outrageous, or otherwise of a character and quality to give rise to a cause of action for the intentional infliction of emotional distress under Idaho law.

92.     Plaintiff suffered severe emotional distress as a result of the conduct of the Defendants.

93.     Plaintiff has sustained damages aforesaid.

### THIRD CAUSE OF ACTION

### Violation Of The Idaho Human Rights Act (I.C. §67-5901, *et seq.*)

94.     Plaintiff Savage realleges all of the foregoing allegations as though fully set forth in haec verba.

95.     Defendant Dennis Dillon, through its agents or supervisors, engaged in a pattern and practice of unlawful racial discrimination and harassment resulting in the termination or constructive termination of Plaintiff Savage based upon his race in violation of the Idaho Human Rights Act contained in I.C. §67-5901, et seq.

96.     Defendant Dennis Dillon, at all times relevant hereto, had actual or constructive knowledge of the conduct of the agents that discriminated against Plaintiff Savage.

97.     Defendant Dennis Dillon violated the Idaho Human Rights Act by tolerating and/or encouraging acts of discrimination based upon Plaintiff Savage's race.

98.     Defendant Dennis Dillon failed to comply with their duty to take all reasonable and necessary steps to eliminate racial discrimination from the workplace and to prevent it from occurring in the future.

99.     As a direct and proximate result of Defendant Dennis Dillon's discriminatory conduct, Plaintiff suffered harassment, embarrassment, mental and emotional distress, aggravation of his pre-existing physical health issues, constructive termination, loss of income, and other special and general damages.

### COMPLAINT AND DEMAND FOR JURY TRIAL

100.    Plaintiff Savage is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendants, and each of them, have engaged in other discriminatory practices against him which are not yet fully known.  Any such additional conduct is incorporated herein by reference to the extent that evidence of it exists in the Defendant's records.

101.    As a further direct and proximate result of Defendants' violation of the Idaho Human Rights Act, as heretofore described, Plaintiff Savage has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship with Defendants, and has thereby incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff Savage.  Plaintiff Savage requests that costs and attorneys' fees be awarded to him.

102.    Plaintiff Savage sustained damages as a direct and proximate result of that discrimination as described above.

103.    As a direct and proximate result of the acts and omissions of Defendants in violation of the Idaho Human Rights Act by and through their agents and/or representatives, Plaintiff Savage has also sustained damages as stated in the prayer for relief below.

### FOURTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

104.    Plaintiff Savage realleges all of the foregoing allegations as though fully set forth *in haec verba*.

105.    The conduct of the Defendants, as aforesaid, was negligent and gives rise to a cause of action for the negligent infliction of emotional distress under Idaho law.

106.     Plaintiff suffered emotional distress accompanied by physical injury as a result of the conduct of the Defendants.

107.     Plaintiff has sustained damages aforesaid.

## FIFTH CAUSE OF ACTION
### Intentional Interference with Prospective Economic Advantage

108.     Plaintiff Savage realleges all of the foregoing allegations as though fully set forth *in haec verba*.

109.     Plaintiff Savage had a reasonable expectation of continued employment with the Defendant employer and a valid economic expectancy of doing so and of working in his field.

110.     Defendants had knowledge of the expectancy.

111.     Defendants intentionally interfered inducing termination of the expectancy.

112.     Plaintiff Savage had a reasonable expectation of being able to continue to work in his field.

113.     Defendants had an improper objective or purpose to harm the plaintiff.

114.     Defendants used a wrongful means to cause injury to the prospective business relationship.

115.     Defendants had an improper objective or purpose to harm the Plaintiff.

116.     As a direct and proximate result of Defendants' use of wrongful means to cause injury to Plaintiff's prospective business relationship, Plaintiff suffered damages as aforesaid.

117.    The injury sustained by the Plaintiff was wrongful by some measure beyond the fact of the interference itself.

118.    Plaintiff was injured as aforesaid and by losing his prospective economic advantage.

## SIXTH CAUSE OF ACTION
### Intentional Interference with Contract

119.    Plaintiff Savage realleges all of the foregoing allegations as though fully set forth *in haec verba*.

120.    Defendants Peder Humlen, individually, Roy Baxter, individually, and Lee Hawkins were aware that Plaintiff Savage had a contract of employment with Defendant Dennis Dillon.

121.    Defendants Peder Humlen, individually, Roy Baxter, individually, and Lee Hawkins intentionally interfered with his contract by creating intolerable working conditions.

122.    Defendants had an improper objective or purpose to harm the plaintiff.

123.    Defendants used a wrongful means to interfere with Plaintiff Savage's contract.

124.    Defendants had an improper objective or purpose to harm the Plaintiff.

125.    As a direct and proximate result of Defendants' use of wrongful means to interfere with Plaintiff Savage's contract, Plaintiff suffered damages as aforesaid.

126.    The injury sustained by the Plaintiff was wrongful by some measure beyond the fact of the interference itself.

127.    Plaintiff was injured as aforesaid.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

WHEREFORE, Plaintiff Savage prays judgment against Defendants as follows:

1.  Special damages, stemming from lost income and benefits, in an amount to be proven at trial.

2.  General damages for pain and suffering, emotional distress, and improperly imposed and undue hardship in an amount that may be proven at trial.

3.  For Plaintiff's reasonable costs and attorneys' fees incurred herein.

4.  For such other and further relief as is equitable in the premises.


Dated March 28, 2014.
SEINIGER LAW OFFICES, P.A.


Wm. Breck Seiniger, Jr.
Attorneys for Plaintiff


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on any and all issues properly triable by jury in this action.

Dated March 28, 2014.
SEINIGER LAW OFFICES, P.A.


Wm. Breck Seiniger, Jr.
Attorneys for Plaintiff


**COMPLAINT AND DEMAND FOR JURY TRIAL**
**-18-**

EEOC Form 161-A (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE
### (CONCILIATION FAILURE)

| To: | Daniel L. Savage<br>5213-1/2 W. Franklin Rd.<br>Boise, ID 83705 | From: | Seattle Field Office<br>909 First Avenue, Suite 400<br>Seattle, WA 98104-1061 |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 38C-2012-00255 | Alexander P. Johns,<br>State & Local Coordinator | (206) 220-6855 |

### TO THE PERSON AGGRIEVED:

This notice concludes the EEOC's processing of the above-numbered charge. The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you. In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case. This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Michael Baldonado*                                    January 16, 2014

Enclosures(s)

**Michael  Baldonado,**
**District Director**

*(Date Mailed)*

cc:

DENNIS DILLON AUTO PARK & TRUCK CENTER, INC.
Robert A. Anderson, Attorney At Law
Anderson Julian & Hull, LLP
P.O. Box 7426
Boise, ID  83707-7426

William Breck Seiniger Jr.
Attorney At Law
942 Myrtle Street
Boise, ID 83702

EXHIBIT 1



**IDAHO**
DEPARTMENT OF LABOR
HUMAN RIGHTS COMMISSION
C.L. "BUTCH" OTTER, GOVERNOR
KENNETH D. EDMUNDS, DIRECTOR



**IDAHO HUMAN RIGHTS COMMISSION**
Pamela Parks, Administrator
Estella Zamora, President
Hyong Pak, Vice President
Ruthie Johnson
Joe B. McNeal
Sheila Olsen
Megan Ronk
Brian Scigliano
Kevin C. Settles
Andrea Wassner

## CASE DISMISSAL AND NOTICE OF RIGHT TO SUE

Wednesday, January 8, 2014

William Breck Seiniger
Seiniger Law Offices
942 W. Myrtle Street
Boise, ID 83702

RE:   Daniel L. Savage vs. Dennis Dillon Auto Park & Truck Center, Inc.
      Complaint Nos.:  E-0512-404; 38C-2012-00255

Dear Mr. Seiniger:

As you know, the Idaho Human Rights Commission found probable cause to believe that illegal discrimination occurred in the above-captioned case. To date we have been unable to find grounds for settlement acceptable to both parties. We are writing to let you know that the Commission will not be filing a lawsuit in this case.

This administrative case is dismissed from the Idaho Human Rights Commission. Since the case is jointly filed with the EEOC, our file will be sent to the EEOC for that agency's review and possible further action. We regret that the matter could not be resolved amicably through the state administrative process.

**Regardless of the EEOC's actions, the Complainant has 90 days from issuance of this notice of dismissal to file a lawsuit in district court under the Human Rights Act. See Idaho Code 67-5908 (2).**

Sincerely,

*Pamela Parks*

Pamela Parks
Director

PP/smn

---

Idaho Human Rights Commission - Idaho Department of Labor
317 W. Main St. ● Boise, Idaho 83735 ● Tel: 208-334-2873 ● Fax:  208-334-2664 ● Web: humanrights.idaho.gov
*An Equal Opportunity Employer and Service Provider. Reasonable accommodations are available upon request. Dial 711 for TTY Idaho Relay Service.*

EXHIBIT 2



**IDAHO**
DEPARTMENT OF LABOR
C.L. "BUTCH" OTTER, GOVERNOR
ROGER B. MADSEN, DIRECTOR



**IDAHO HUMAN RIGHTS COMMISSION**
Pamela Parks, Administrator
Estella Zamora, President
Hyong Pak, Vice President
Ruthie Johnson
Joe B. McNeal
Sheila Olsen
Megan Ronk
Brian Scigliano
Kevin C. Settles
Andrea Wassner

Monday, April 22, 2013

Mr. Daniel L. Savage
5213 ½ W. Franklin Rd
Boise, ID 83705

Re:    Daniel Savage vs. Dennis Dillon Auto Park & Truck Center, Inc.
       Complaint Nos.: E-0512-404; 38C-2012-00255

Dear Mr. Savage:

Enclosed you will find the Commission's Determinations in the above-captioned discrimination complaint. The Commission has found probable cause to believe that Respondent has violated the law.

The senior investigator, Sarah Mae Fisher, will be contacting you regarding resolution of this matter. She will work with both parties to try to find mutually acceptable terms of settlement. At the same time, she may also identify terms sought by the Commission to address the interests of the public. The Commission's goal in settling these cases is two-fold:  a) to address the needs of the victim(s) of discrimination; and b) to try to assure that others are not subjected to similar discrimination in the future. This means the Commission generally seeks "make whole" relief for identified victims of discrimination, training on state and federal equal opportunity laws, and appropriate changes in any of Respondent's policies or practices that may have resulted in illegal discrimination. Ms. Fisher will let you know what the Commission seeks specifically to resolve this case.

If a voluntary resolution cannot be worked out, the Commission and/or the Complainant may file an action in district court.  In our experience, voluntary out-of-court resolutions are generally preferred by all sides, so the Commission's efforts at this time will work towards that end.  If you have any questions, do not hesitate to contact Ms. Fisher.

                       Sincerely,

                       *Pamela Parks*

                       Pamela Parks
                       Administrator

PP/smn

Enclosure

EXHIBIT 3

## BEFORE THE IDAHO HUMAN RIGHTS COMMISSION

| | | |
|---|---|---|
| **Daniel L. Savage**, Complainant | Case Nos.: | E-0512-404 |
| | | 38C-2012-00255 |
| vs. | | |
| | Bases: | Race |
| **Dennis Dillon Auto Park and Truck Center, Inc.,** | | |
| Respondent | Issues: | Intimidation |
| Boise, Idaho | | |
| | INVESTIGATOR'S REPORT AND | |
| | COMMISSION DETERMINATION | |

## SUMMARY OF INVESTIGATION

### A.    Complainant's Position

Since 2009, Complainant has had three separate periods of employment with Respondent. Complainant began working for Respondent's Kia car dealership as a sales advisor on December 11, 2011. Complainant alleges that within two weeks of his re-hire, his co-workers began subjecting him to harassment based on his race, Black. Complainant gave the following examples:

- Co-worker Peder Humlen was wearing a cartoon tie. Complainant asked what was on his tie, and Mr. Humlen responded, "A spook."[1] Complainant asked him what he said, and he responded, "You heard me; it's a spook just like you." Co-worker Ray McKenna noted that there was no ghost on Mr. Humlen's tie. Complainant asked Mr. Humlen why he called him a "spook" and he responded, "I don't know."

- A couple of days later, Mr. Humlen said, "You know, Dan, you're nothing but a mammy."[2] Complainant asked Mr. Humlen why he called him another racial name and he responded, "Because I can."

Subsequent to Mr. Humlen's comments in December 2011, Complainant complained to managers Jason Erickson and Mike Booher. They met with Mr. Humlen, and he admitted making the comments. Mr. Humlen was asked why he said such things to Complainant, and Mr. Humlen stated that he was mad at Complainant for something that happened at another dealership where they worked together. Human Resources Officer Tina Adams was consulted. Complainant was told that Mr. Humlen was written up and that another infraction would result in his discharge. Mr. Humlen and Complainant were told to stay away from one another, and Complainant was told to keep what happened at another dealership separate from Respondent.

---

[1] www.Merriam-Webster.com defines "spook" as a ghost or specter. www.Urbandictionary.com defines "spook" as a derogatory slur for a person of African descent.

[2] www.Merriam-Webster.com defines "mammy" as: 1: Mama, 2: a Negro woman serving as a nurse to white children esp. formerly in the southern U.S.

EXHIBIT 3

- Comments were also made by coworkers Roy Baxter and Lee Hawkins: Mr. Baxter asked, "Hey, Dan, if I throw this banana on the ground, would you pick it up?" Complainant told Mr. Baxter that his comment was not funny.

- On January 4, 2012, Mr. Baxter was with a customer and he said, "Hey, Dan, we know that Black is beautiful, but White is superior." Mr. Baxter repeated that same comment to Complainant on January 7, 2012.

- Also on January 7, 2012, Mr. Baxter said, "I do not know how Black people sell cars, but we White people sell them this way." That evening, Mr. Baxter called Complainant "boy." When Complainant protested, Mr. Baxter said, "Listen, boy, I was just playing with you and that is how we talk where I come from."

- On January 7, 2012, coworker Lee Hawkins asked, "Hey, guys, how come I cannot use the word 'nigger'?"

Subsequent to the January 7 comments, Complainant complained to management about Mr. Baxter and Mr. Hawkins. Management met with Mr. Baxter, who confirmed that he had made the comments, and said that he was just "playing around."

Around this time, Mr. Humlen stated to coworker Clayton Hall that he wanted to go back and "kill all the niggers" who work at Respondent. Complainant was the only Black employee at the Kia dealership. Mr. Hall reported the comment to management.

On or around January 10, 2012, Complainant met with CEO Duane Sessions and Human Resources Officer Tina Adams regarding what happened. Complainant told them about all of the incidents. Complainant was told that an investigation would be conducted. Later that day, Complainant was informed that Mr. Baxter and Mr. Hawkins were written up for their comments. Complainant was also offered the opportunity to transfer to another dealership. Complainant was not informed about whether any further action was taken with Mr. Humlen based on Mr. Hall's report.

Following the January 10 meeting, Human Resources conducted store-wide training on discrimination and harassment.[3]

In March 2012, after hearing Mr. Baxter and Mr. Hawkins make derogatory comments about how "fat and lazy Mexican women are," Complainant decided to accept Mr. Sessions' offer to transfer to another dealership. Complainant transferred to Respondent's Nissan dealership on March 9, 2012.[4]

---

[3] Complainant states that the incident between Mr. Hall and Mr. Humlen occurred after the training. The investigation was unable to resolve the specific date of the incident with Mr. Hall, and whether the date provided for the meeting between Complainant, Mr. Sessions and Ms. Adams is correct.

[4] In his interview, Complainant stated that he did not inform Respondent of these comments.

2 – Savage vs. Dennis Dillon Auto Park & Truck Center, Inc.

EXHIBIT 3

Subsequent to leaving the Kia dealership, on March 13, 2012, Complainant was contacted by Steve Hazlett, a friend of his who had worked with Complainant and Mr. Humlen at a different dealership. Mr. Hazlett informed Complainant that he applied for a job at Respondent's Kia dealership, and while there he spoke with Mr. Humlen. Mr. Hazlett said that while they were discussing Complainant leaving the dealership, Mr. Humlen told Mr. Hazlett that he does not like "niggers."

On March 17, 2012, Complainant met with Mr. Sessions and Ms. Adams regarding what Mr. Hazlett told him. Complainant was informed that they met with Mr. Humlen regarding his comments and that he was notified of Respondent's policies. To Complainant's knowledge, no further disciplinary action was taken in regards to Mr. Humlen, despite the previous assurances that any further race-based conduct by Mr. Humlen would result in his discharge. Complainant believes that Respondent took appropriate corrective action with Mr. Baxter and Mr. Hawkins. However, Complainant does not believe that Respondent has taken appropriate corrective action with Mr. Humlen, who Complainant asserts continued to make derogatory race-based comments and continues to work at Respondent.

### B.    Respondent's Position

Respondent denies that it discriminated against Complainant.[5]    Respondent agrees that Complainant complained to his supervisor, Mr. Erickson, in mid-December 2011 that Mr. Humlen made an inappropriate comment of a racial nature to him. Complainant alleged that he saw Mr. Humlen wearing a cartoon tie, asked him what was on the tie, and Mr. Humlen said that it was a picture of "a spook…a spook like you." Mr. Erickson interviewed Mr. Humlen, who stated that he did not intend to use the term "spook" in a derogatory manner, and denied saying "spook like you." Mr. Humlen was verbally reprimanded for the comment and told only to wear professional (non-novelty) ties to work. Mr. Humlen asserts that Complainant never confronted him about being offended by the comment.

Respondent admits that Complainant complained that Mr. Humlen called him a "mammy," and Mr. Humlen admits to making the statement. However, Mr. Humlen states that he meant the comment to mean a weak or "girly" individual. Mr. Humlen asserts that the comment was made in response to derogatory and inappropriate comments regarding his wife made by Complainant.

Respondent agrees that Complainant again complained to management in mid-January 2012 regarding comments made by Mr. Baxter. Complainant alleged that Mr. Baxter used the terms "you people" and "boy" when referring to Complainant, and he relayed the banana incident and the "Black is beautiful, White is superior" comment. Respondent immediately investigated the complaint. Respondent's chief financial officer, Mr. Sessions, interviewed Mr. Baxter. Mr. Baxter admitted to using the term "boy," but stated that it was not directed at Complainant and that many employees, including Complainant, used the term in jest. Mr. Baxter denied making a comment about the differences between the way White people and Black people sell cars. Mr. Baxter stated that he said "you people" in the context of selling techniques, was referring to competing sales teams at the dealership, and did not intend a racial undertone. Mr. Baxter did

---

[5] Respondent provided a response to Complainant's charge and a response to Complainant's rebuttal, as well as affidavits from Duane Sessions, Jason Erickson, Roy Baxter, Lee Hawkins, Peder Humlen, and Tina Adams.

**EXHIBIT 3**

admit to making the "Black is beautiful, White is superior" comment, but stated that it was made in a joking manner while Complainant was also engaging in teasing banter by saying that Black people were better looking. Mr. Baxter states that Complainant never came to complain to him personally. Ultimately, Mr. Baxter admitted that some of the comments were inappropriate, even if he did not intend to offend Complainant or any other employee. Mr. Sessions informed Mr. Baxter that any further inappropriate language or comments with a racial undertone would not be tolerated. Mr. Baxter received a written reprimand, was suspended from work for one day without pay, and was informed that he would be immediately terminated upon report of any further incidents of this type.[6] Mr. Baxter was required to attend anti-discrimination training. According to Mr. Baxter, after he was informed of the complaint, he approached Complainant and apologized for doing or saying anything that would offend him.

Respondent states that Mr. Sessions interviewed Mr. Hawkins in reference to a complaint made by Complainant that Mr. Hawkins had asked Complainant why White people cannot use the phrase, "what's up nigga" in the same way that Black people use the phrase to say "how are you doing." Mr. Hawkins admitted making the comment, indicated that he did not mean to offend Complainant and stated that Complainant never complained to him that he was offended by what was said. Mr. Hawkins told Mr. Sessions that he felt bad that Complainant had complained. Mr. Hawkins was suspended for one day without pay, and Respondent informed him that any further inappropriate racial comments or behavior related to race would not be tolerated. Mr. Hawkins was required to attend anti-discrimination training. Mr. Hawkins asserts that Complainant would refer to White sales consultants as "you people." Mr. Hawkins denies that he or anyone else ever said "you people" as a way of differentiating between White and Black people or to offend anyone.

Respondent states that Mr. Sessions conducted a follow-up with Complainant on January 26, 2012, to learn whether the situation at the dealership was improving. Respondent asserts that Complainant stated that he was being treated well by managers and employees, he had extended an "olive branch" to Mr. Baxter and Mr. Hawkins, and their relationships had been mended. Respondent states that Complainant informed Mr. Sessions that he felt Respondent had handled his complaints appropriately. Complainant was offered the opportunity to transfer to the "Big Lot" (a used car dealership on the same lot as the Kia dealership) if he felt uncomfortable at the Kia store, and he declined.

Respondent states that on January 29, 2012, the sales staff were playing a game involving spinning a wheel to determine bonus levels, and that when Complainant spun a high number, he yelled in his excitement in the general direction of Mr. Erickson, "What do you think about that, BOY." Mr. Erickson was very surprised by this statement, and told Complainant that the statement was not acceptable, especially considering that he had complained on a prior occasion that he was offended by the use of the term "boy." Respondent asserts that Complainant complained that people were just being too sensitive.

Respondent reports that, on March 7, 2012, Complainant called Respondent's Payroll and Human Resources manager, Tina Adams, to request a transfer to Respondent's Nissan store.

---

[6] Mr. Sessions' affidavit states that Mr. Sessions told Mr. Baxter that he would be disciplined up to and including termination upon report of further instances of this type.

EXHIBIT 3

When asked why he was requesting a transfer, he refused to provide any details. Complainant specifically denied experiencing any retaliation at the Kia store; he merely stated that there were too many "hurt feelings" there, and therefore he wanted to transfer. Mr. Sessions also interviewed Complainant regarding the request, and Complainant denied any new discrimination and stated that he wanted the transfer because he was looking for a "clean slate." Mr. Sessions approved the transfer, which was effective March 9, 2012.

Respondent states that on March 15, 2012, Ms. Adams received a telephone call from Complainant, stating that a previous co-worker of his and Mr. Humlen's, Steve Hazlett, had gone to the Kia store to apply for a job there. While there, Complainant stated that the subject of Complainant came up, and Mr. Humlen said that he does not like "niggers." Mr. Sessions interviewed Mr. Humlen, who denied making the comment, and stated that he did not like Complainant because Complainant had made inappropriate and threatening comments about Mr. Humlen's wife. Mr. Sessions reminded Mr. Humlen that Respondent has zero tolerance for foul or inappropriate language in the workplace.

Mr. Humlen states in his affidavit that he and Complainant previously worked together at another dealership, and that their relationship was cordial until Complainant began to treat him in an abusive manner, such as walking past him and bumping his shoulder and making fun of him. Mr. Humlen asserts that Complainant also made derogatory comments about his wife and the fact that she is younger than him. Mr. Humlen asserts that at least once, Complainant made the comment that his wife "needed a little Black in her" and implied that he would rape or abuse her. Mr. Humlen states that at that time he attempted to avoid communicating with Complainant. Once Complainant came to work for Respondent, Mr. Humlen asserts that Complainant's inappropriate comments towards Mr. Humlen's wife resumed, and that he told Complainant numerous times that he wanted the comments to stop. Mr. Humlen states that he did not complain to management because he chose to try and resolve the situation himself, since he felt it should be able to be resolved between two men.

Mr. Humlen denies ever witnessing anyone make derogatory remarks about Complainant at Respondent. Mr. Humlen denies ever using the term "nigger" to describe Complainant, and denies making any statements of a racial nature to Complainant while Complainant was still employed by Respondent. Regarding the tie incident, when Complainant asked Mr. Humlen what was on his tie, he replied a "spook," meaning a scary ghost or creature. The tie was Halloween-themed and had a scary cartoon creature on it. Mr. Humlen states that Complainant never confronted him saying that he was offended by the comment, but Mr. Erickson informed him that Complainant had complained. Mr. Humlen reports that he was verbally reprimanded by Mr. Erickson for making the comment. Regarding calling Complainant a "mammy," Mr. Humlen states that he and Complainant were involved in a verbal confrontation where Complainant had made derogatory statements about Mr. Humlen's wife, and that Mr. Humlen called Complainant a "mammy," meaning a weak or "girly" individual. Mr. Humlen denies that his dislike of Complainant, or their disagreements, had anything to do with race, but rather Mr. Humlen thought that Complainant was offensive and a mean-spirited coworker.

EXHIBIT 3

## C.    Other Evidence Considered

Respondent provided the following documentation:

- An email dated December 15, 2011, from Tina Adams to Duane Sessions, with the subject "Dan Savage/Peder Humlen." The email states, "Jason Erickson came to me today because Dan had come to him regarding Peder (Peter). Dan told Jason he did not want anyone fired or any further action, but wanted to make Jason aware of the situation. I told Jason I would email you with the incident. Here is what Jason sent to me." The email includes what is apparently a written statement from Mr. Erickson to Ms. Adams, and states the following:

  > I spoke with both Peder and Dan about the comments that were made to each other. From what I understand, Dan had previously said something about Peder's wife while working together over at Internet Auto. I told them that what happened over there has nothing to do with what happens on this showroom. While in Dan's presence, Peder was asked what was on his "Holiday" tie, and he referred to the characters on the tie as, "Spooks". At some point Peder also used the comment "Mammy", which is supposedly slang for a female slave.

  > I told Peder that regardless, the two of them are both men, and that if there is a problem with one another it needs to be discussed without using any racial comments, and he agreed that he would not do that in the future. I told Dan that there doesn't need to be any comments made about Peder's wife in the future as well, and he agreed that he wouldn't say anything more about Peder's wife.

  > At this point I believe everyone is on the same page and we shouldn't have any further issues. I warned them that if there were any future issues, they would be dealt with swiftly and appropriately.

- An online survey from a customer of Respondent's that states that Mr. Humlen was his salesperson on December 20, 2011, and that Mr. Humlen "could have not been vulgar in front of my family. The salesman was pretty bad." A specific description of the incident was not provided by the customer. An accompanying email from Mr. Erickson to Ms. Adams (in which Mr. Booher is copied), states that Mr. Erickson counseled Mr. Humlen to remain professional at all times, and that if any more surveys like that were received "he would no longer be employed at the dealership."

- An Employee Warning Form for Roy Baxter, dated January 18, 2012, which states that "Roy made several discriminatory remarks to Dan Savage, such as 'black is beautiful, but white is superior,' 'you people' and 'boy.'" The "Actions to be taken" section states "One day suspension from work (January 18, 2012) Never use any discriminatory language or terms." The document states that no previous warning was given. Under "Additional comments," "Attend class provided at dealership regarding sexual

EXHIBIT 3

harrassment [sic] and discrimination," and "If something like this happens again you will be subject to discipline up to and including termination." It is signed by Mr. Baxter with a date of January 19, 2012, and is also signed by the "Department Head."[7]

• Typewritten notes from Tina Adams that state the following:

> March 16 –
>
> Meeting with Duane Sessions and Peder Humlen
>
> Duane asked Peder if he had had a conversation with Steve [Hazlett] whom [sic] had come into apply. Peder said yes he did, he knew him from Internet Auto. He came in looking for a job, and Peder told Mike [Booher] he knew him. Duane asked what the conversation was about. Peder said he told him he had 5 cars out for the month and that the half was looking good. Peder also said he told Steve Mike was a good guy.
>
> Duane asked Peder if he talked about Dan. Peder said yes, he told Steve that Dan was at the Nissan lot. Duane asked Peder if he called [Complainant] the "N" word, or talked about previous issues with [Complainant]. Peder said "No way" the "N" word is forbidden. He said he stay's [sic] out of it. He wouldn't use that word.
>
> March 17 –
>
> Meeting with Duane [Sessions] and [Complainant]
>
> Duane told [Complainant] that the issue with Peder [Humlen] is a personnel issue. Asked him why he would text Clayton [Hall].[8] That is feeding the fire. Duane told him he needed to stay out of it. Duane informed [Complainant] that he had explained the policy with Peder, it is a personnel issue and has been handled.
>
> [Complainant] asked what that meant. He said this was his third incident with Peder....three... Duane asked [Complainant] if he heard Peder say it. Dan said no he didn't. Duane told [Complainant] that he talked with Peder and explained the policy as a company. Duane told [Complainant] sending a text to another employee is fueling the fire.
>
> Duane asked [Complainant] how things were going at Nissan, Dan said great he was very happy there.

---

[7] Only Mr. Baxter's Employee Warning Form was requested, and not Mr. Hawkins', since Mr. Hawkins admitted in his affidavit to making the statement he was accused of and being disciplined.
[8] According to Complainant, the text said, "I heard Peter [Humlen] got fired?"

EXHIBIT 3

> Duane told [Complainant] at this point we have dealt with it, if anything pops up to let Tina [Adams] know.

- The "All Owned Dennis Dillon Entities Employee Handbook."

Complainant provided a rebuttal to Respondent's response, and was interviewed. Respondent CFO Duane Sessions, Manager Jason Erickson, Manager Mike Booher, and former Sales Consultants Clayton Hall and Ray McKenna were interviewed. Stephan Hazlett, a former co-worker of Complainant and Mr. Humlen's from a different car dealership, was also interviewed.

**Complainant** denies insulting Mr. Humlen or doing anything negative or derogatory towards him. Complainant further denies ever implying or threatening to rape or abuse Mr. Humlen's wife. Complainant states that at the previous dealership where he and Mr. Humlen worked together, Mr. Humlen said that his wife was thinking of sleeping with a Black man, and Complainant and another Black coworker said, "Maybe she wants a Black man."

Complainant agrees that Mr. Sessions checked in with him regarding the discipline of Mr. Baxter and Mr. Hawkins.[9] Complainant states that Mr. Sessions asked whether Complainant felt that the discipline of Mr. Baxter and Mr. Hawkins was appropriate. Complainant told him that such a determination was their [management's] job, and if they thought the discipline was appropriate, then it was appropriate.

Complainant states that he did not feel safe after learning about the comments Mr. Humlen made to Mr. Hall, which Complainant asserts occurred after the anti-discrimination training at Respondent. Complainant was going to approach management about the comments, but Mr. Hall said that he would do it. Complainant maintains that Respondent's failure to do anything about Mr. Humlen also caused him to feel unsafe and uncomfortable. Complainant asserts that Mr. Humlen repeatedly told coworkers that he hated Complainant, and Mr. Humlen's attitude toward Complainant caused coworkers to ask Mr. Humlen several times why he hated Complainant so much. On one occasion, while speaking about Complainant, Mr. Humlen ground his teeth so hard that he chipped a tooth due to his hate for Complainant.

After the incident in March when Mr. Hazlett told Complainant that Mr. Humlen did not like "niggers," Complainant complained to Mr. Sessions and Ms. Adams. He was asked if he heard the comments himself. Complainant said "no," but Respondent never contacted Mr. Hazlett to ascertain what happened first hand. During that meeting, Mr. Sessions told Complainant that he had seen a text Complainant sent to coworker Clayton Hall. The text said, "I heard Peter got fired?" Complainant told Mr. Sessions that the text was not inflammatory. Complainant states that Respondent did not do anything about Mr. Humlen. This failure to act caused a toxic environment at Respondent and nobody cared. Management's response was simply that they needed to get along. Complainant states that the atmosphere at Respondent left him depressed and affected his ability to sell cars, and this continued even after he transferred to the Nissan dealership. Complainant states that he had to see Mr. Sessions and Respondent's owner Mr. Dillon at weekly meetings while at the Nissan dealership, which would bring it all back up, and

---

[9] According to Mr. Sessions, this meeting occurred on January 26, 2012.

EXHIBIT 3

that is why he ultimately left his employment with the Nissan dealership and Respondent in May 2012.[10]

**Duane Sessions**, Respondent's CFO, states that the reason there was a difference in discipline between Mr. Humlen and Messrs. Baxter and Hawkins is because the complaints regarding Mr. Baxter spanned over a period of time, and Mr. Hawkins used the "N word," which is extremely inappropriate and of the magnitude that it required more discipline. Mr. Sessions asserts that Complainant made no complaint regarding the conversation between Mr. Hall and Mr. Humlen. Mr. Hall approached Mr. Sessions one day at the dealership and told him that while driving Mr. Hall home from work, Mr. Humlen told Mr. Hall something to the effect that the only reason Mr. Humlen did not hurt or kill Complainant, or the only reason Complainant is alive, is because Complainant has a family. Mr. Hall told Mr. Sessions that he wanted him to know. Mr. Sessions does not recall having any safety concerns regarding what Mr. Hall told him. Mr. Sessions does not recall Mr. Hall telling him that Mr. Humlen said he wanted to "kill all the niggers." Mr. Sessions consulted with Respondent's attorney, and they came to the conclusion that the conversation took place off of the premises of Respondent, and therefore there was not anything for Respondent to do.

Mr. Sessions confirmed that Complainant called Mr. Erickson "boy" during the wheel spinning game played for bonuses on January 29, 2012, and states that others have been suspended for making comments like that. Mr. Sessions states that he was shocked, and called Marvin Harris, an African-American friend of Complainant's who works in Respondent's finance department, to speak to Complainant about it. Complainant said that people were being too sensitive, and Mr. Harris told him that he cannot have it both ways. Mr. Sessions wanted Mr. Harris to help Complainant understand that they all have a duty to use appropriate language in the workplace.

Regarding Complainant's allegation that Mr. Humlen stated that he does not like "niggers" while discussing Complainant with Kia store applicant Steve Hazlett, Mr. Sessions states that Mr. Hazlett was not an employee of Respondent, and that the alleged conversation took place "outside on the stairs." Mr. Sessions states that he was notified of Complainant's complaint on the matter, and Mr. Humlen denied making the comment. Mr. Sessions informed Mr. Humlen of Respondent's policy on inappropriate comments and that making comments of that nature would involve discipline up to and including termination, so that Mr. Humlen would know what the policy was if such a comment was made and how Respondent would deal with it. Mr. Sessions did not contact Mr. Hazlett to ask him about the incident.

**Jason Erickson**, manager at Respondent, states that Complainant told him that Mr. Humlen called him a "spook," a racial term, when discussing a tie that Mr. Humlen was wearing. The tie was black with animated cartoon characters on it that Mr. Erickson believes were ghosts. Mr. Erickson does not recall if Complainant said there were witnesses. Mr. Erickson felt that he did not need a witness and had enough information. In response, Mr. Humlen stated that the character on the tie was a "spook" or "ghost." Mr. Erickson told Mr. Humlen that if the term was used with a derogatory intent, that was unacceptable. Mr. Humlen denied that was his motive. Mr. Humlen did not bring up any current or past problems with Complainant. Mr.

---

[10] Complainant did not add a constructive discharge allegation to his charge.

9 – Savage vs. Dennis Dillon Auto Park & Truck Center, Inc.

EXHIBIT 3

Erickson does not recall if he discussed what would happen if there were further infractions from Mr. Humlen.

Regarding the "mammy" comment, Mr. Erickson states that Complainant informed him that Mr. Humlen had called him a "mammy." Mr. Erickson did not know the meaning of the word. Complainant told him that it refers to a female slave. Mr. Erickson told Mr. Humlen that he was unaware of what the word meant, and asked Mr. Humlen if he said it and what his intention was. Mr. Humlen said that it meant "girlie." Mr. Erickson told him not to use that word anymore. Mr. Erickson explained to Mr. Humlen the definition that Complainant gave.

Mr. Erickson states that Complainant came to him regarding his complaints against Mr. Baxter and Mr. Hawkins. Mr. Erickson informed Ms. Adams in Human Resources, and Mr. Sessions. An investigation was launched, and Mr. Erickson was interviewed regarding what he had learned. Mr. Erickson did not make the decisions regarding the investigations or discipline. He was not part of the report from Mr. Hall or the complaint regarding Mr. Hazlett. Mr. Erickson has never had to discipline Mr. Humlen.

Mr. Erickson states that during the bonus wheel spinning game, Complainant was very loud and rather in Mr. Erickson's face, only a couple of feet from him, and looked him in the eye when he said "boy." Mr. Erickson states that they were not having any issues with one another when this happened.

**Mike Booher**, manager at Respondent, states that his boss is Mr. Erickson. There are two supervisors at Respondent because there is more than one shift. Mr. Booher received a complaint from Complainant after the banana comment from Mr. Baxter. Mr. Booher, Mr. Erickson, and Mr. Sessions looked into it and suspended Mr. Baxter. The incident was brought to the attention of management because when the banana comment was made, Mr. Baxter and Complainant got into a loud argument, and several salesmen came to him and let him know so that it did not escalate into a physical confrontation. Mr. Baxter did not like Complainant getting into his face after the comment was made. Mr. Baxter admitted to the comment. When they got Complainant's side of the story he made known the other complaints he had regarding Mr. Baxter and Mr. Hawkins.

Mr. Booher heard about the tie incident in the showroom. He does not recall a complaint regarding the "mammy" comment.

When Mr. Booher gave Mr. Hall a ride home one evening, Mr. Hall told him that Mr. Humlen is a racist. Mr. Hall said that when Mr. Humlen was giving him a ride home on another occasion, he used the "N word" a few times. Mr. Booher states that he told Mr. Hall to take the situation to Mr. Sessions. Mr. Hall did not request that anything be done about the incident.

Mr. Booher states that Complainant told him that he was upset by Mr. Baxter calling him "boy" because where he comes from in the south, the term is derogatory and means that you are saying the person is a boy and would not amount to what a man could do. Not long after Complainant gave this explanation, the wheel spinning game occurred where Complainant called Mr. Erickson

EXHIBIT 3

"boy." Mr. Booher states that the whole room went silent in response, and then everyone went on playing the game.

**Clayton Hall**, former sales consultant at Respondent, states that at the end of January 2012, during Respondent's sale,[11] Mr. Humlen gave him a ride home. Mr. Hall states that during the drive, Mr. Humlen stated something to the effect of, if Complainant did not have a family, Mr. Humlen would hurt or kill him, and said that Mr. Humlen wished all Black people were dead. The comments made Mr. Hall feel uncomfortable, and he told that to Mr. Humlen. The next day Mr. Hall told his supervisor, Mr. Booher, about the conversation. He told Mr. Booher that he did not want to work with Mr. Humlen, and gave the ultimatum that it was him or Mr. Humlen. Mr. Hall did not feel that Mr. Booher was doing anything about the situation, and so a couple of days later he spoke to Mr. Sessions, who is a family friend. He gave Mr. Sessions the same ultimatum. Complainant was going to approach management about the comments, but Mr. Hall said that he would do it. Mr. Hall confirmed with Complainant that he had spoken to Mr. Sessions.

Mr. Hall states that in response to his reporting the comments to management, he expected Mr. Humlen to be fired. He thought it was the last straw since Mr. Humlen was not well-liked by most of the salesmen at Respondent, and they wanted him out. Mr. Hall states that after he spoke to Mr. Sessions, he spoke to Mr. Booher again about Mr. Humlen, stating that he felt uncomfortable working with Mr. Humlen.

Mr. Hall states that neither Mr. Booher nor Mr. Sessions ever got back to him regarding his ultimatum. A week or two later he was placed on an opposing shift from Mr. Humlen, but he does not know if that was in response to his report to management, because shifts were often changed. Even on separate shifts, there is a daily two-hour shift overlap, and all sales personnel work together on Saturdays at Respondent.

Mr. Hall states that he told Mr. Humlen that he went to management regarding the conversation, and he openly told Mr. Humlen several times, around other coworkers, that his comments were uncalled for and Mr. Hall did not want to hear such things. Mr. Humlen did not have much of a response. Mr. Hall also spoke to other coworkers about the incident, and he is fairly certain that Mr. Erickson knew about it, since the incident was discussed openly at Respondent.

Mr. Hall states that at some point, Complainant stopped interacting and would sit in the corner. Although Complainant had more enthusiasm for approximately the first month of the job, he did not after that.

Mr. Hall states that he does not feel that Complainant was discriminated against at Respondent, because coworkers would joke all the time, including Complainant, and it was no big deal and did not bother Mr. Hall, even when topics such as Mr. Hall's religion were made fun of. Mr. Hall states that Complainant would call him and others, "boy," "mother-f-er" and those sorts of names, but it did not bother him. Mr. Hall does not recall the bonus wheel spinning incident. Mr. Hall left his position at Respondent in April 2012, but the conversation with Mr. Humlen and management's lack of response to his ultimatum had nothing to do with it.

---

[11] An internet search revealed the dates of Respondent's sale at the Expo as January 25-29, 2012.

11 – Savage vs. Dennis Dillon Auto Park & Truck Center, Inc.

EXHIBIT 3

**Ray McKenna**, former sales consultant at Respondent, worked at Respondent for approximately one year, and left in January 2012. Mr. McKenna states that he was present for an incident where Complainant asked Mr. Humlen what was depicted on his tie, and Mr. Humlen said that they were "spooks." Mr. McKenna told Mr. Humlen that there were no ghosts on his tie. Mr. McKenna asserts that what was depicted on the tie was the word "Ford" and pictures of Ford cars. He is not aware of Mr. Humlen saying "spook like you" to Complainant, only that the tie depicted "spooks." Mr. McKenna did not know if Complainant had complained to management about the comment, and could not tell whether Mr. Humlen meant the statement to be derogatory. Complainant and Mr. Humlen knew each other previously, and were not friends. Mr. Humlen did not like Complainant based on their past relationship at another dealership. Complainant and Mr. Humlen did not bicker, they stayed away from one another. Mr. McKenna was not aware of a confrontation between Complainant and Messrs. Baxter and Hawkins. He left Respondent the week before Respondent's big sale at the Expo in January 2012.[12]

**Steve Hazlett** states that he worked with Complainant and Mr. Humlen at a previous dealership. Last year [2012] he went to Respondent's Kia dealership to inquire about a job. As he was leaving, he saw Mr. Humlen outside, leaning on the railing of the ramp that leads to the front door. Mr. Humlen stopped him to talk. Mr. Hazlett does not like Mr. Humlen, but stopped to be polite. Mr. Hazlett asked where "Big Dan" was, referring to Complainant and his large size. Mr. Humlen proceeded to tell him a story about how he and Complainant had gotten into an argument, and Mr. Humlen had called Complainant to fight outside on the dealership lot. Mr. Humlen said that he called Complainant a "nigger" on Respondent's showroom floor in order to goad him into a fight, but Complainant turned his back and walked away. Mr. Hazlett did not believe Mr. Humlen's story, since Complainant is a big, strong guy and it did not seem credible that Mr. Humlen would say such things to Complainant and risk receiving a beating. Mr. Hazlett called Complainant and relayed the story. Complainant told him that Mr. Humlen had tried to get him to fight, but had not called him the "N word" during that incident. Complainant later told Mr. Hazlett that he went to management regarding the incident Mr. Humlen had with Mr. Hazlett. A couple of weeks after the conversation with Mr. Humlen, Mr. Hazlett returned to Respondent to follow-up on his job search and spoke with Mr. Booher. Mr. Hazlett told Mr. Booher that he was surprised that nothing had been done about Mr. Humlen, and Mr. Hazlett believes that he repeated to Mr. Booher what had occurred. Mr. Booher said that he could not discuss it, but that they were aware of the situation. Regarding whether Complainant said derogatory things about Mr. Humlen's wife at the previous dealership, Mr. Hazlett said that he heard Mr. Humlen make derogatory sexual comments regarding his own wife, but that Complainant is not the kind of person who would say such things.

## COMMISSION DETERMINATION

To establish his claim of harassment based on race, Complainant must prove that he was subjected to unwelcome, offensive or intimidating conduct because of his race that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.

---

[12] Since Respondent's sale at the Expo was January 25-29, 2012, Mr. McKenna's last day at Respondent was therefore sometime during the week of January 15-21, 2012.

12 – Savage vs. Dennis Dillon Auto Park & Truck Center, Inc.

EXHIBIT 3

An employer is liable for harassment by a coworker if it knew or should have known of the harassment and failed to take immediate and appropriate corrective action. The purpose of appropriate corrective action is to end the current harassment and deter future harassment.

In his charge, Complainant agrees that Respondent appropriately handled his complaints regarding Mr. Baxter and Mr. Hawkins. Complainant, however, does not feel that Respondent took appropriate corrective action in regards to Mr. Humlen. Complainant asserts that Mr. Humlen has engaged in a pattern of racially discriminatory behavior towards him.

Complainant complained to Respondent in mid-December 2011 that Mr. Humlen had made race-based comments to him. While these comments on their own would likely be insufficient to support a hostile work environment claim, at that time Respondent was put on notice that Mr. Humlen had made such comments on two separate occasions. Contrary to Respondent's action towards Mr. Baxter and Mr. Hawkins, the response to the complaints regarding Mr. Humlen consisted merely of telling him that if the comments he made were meant to be derogatory, that was unacceptable, and to refrain from wearing novelty ties. Respondent's response to Mr. Humlen's behavior seems incongruent with that of Mr. Baxter and Mr. Hawkins, who were written up and received one-day suspensions without pay.

More troubling, however, are the statements reported by Mr. Hall. Although Complainant's recollection of what Mr. Hall relayed differs somewhat from that of Mr. Hall and Mr. Sessions[13], each version conveys an expression of malice towards Complainant based on race. Respondent asserts that it had no duty to act regarding the comments reported by Mr. Hall, because the comments occurred outside of the workplace and were not said to Complainant. However, conduct occurring outside of the workplace that *affects* the workplace is actionable. Mr. Hall was so offended by the comments that he gave members of management the ultimatum that he would not work with Mr. Humlen, and that it was him or Mr. Humlen. Mr. Hall reports that he discussed the matter with Mr. Booher on an additional occasion and said that he felt uncomfortable working with Mr. Humlen. Mr. Hall states that he discussed the incident with Complainant, other coworkers, and even Mr. Humlen, and everyone knew about it at Respondent. The situation therefore carried over into the workplace.

Although Complainant did not complain to management about the comments, he knew about them, and he and Mr. Hall agreed that Mr. Hall would tell management because Mr. Hall was the one who had first-hand information. Mr. Hall confirmed with Complainant that he had, in fact, complained.

---

[13] Complainant states that Mr. Hall said that Mr. Humlen's comments were that he wanted to go back to Respondent and "kill all the niggers." Mr. Hall states that Mr. Humlen said something to the effect of, if Complainant did not have a family, he would hurt or kill Complainant, and that he wished all Black people were dead. Mr. Sessions' recollection was that Mr. Hall told him that Mr. Humlen's comments were something to the effect that if Complainant did not have a family, he would hurt or kill him. Mr. Booher's recollection of Mr. Hall's description differs more significantly from the others. He recalled that Mr. Hall said that Mr. Humlen is racist and that he used the "N word" several times during a conversation with Mr. Hall.

EXHIBIT 3

The statements Mr. Hall states Mr. Humlen made about Complainant discussed bodily harm towards Complainant based on his race, and a wish that all members of his race were dead. Although expressed as a "wish," the comments were severe enough to result in the discomfort of both Mr. Hall and Complainant, who additionally felt unsafe. It is not unreasonable that Complainant would feel unsafe working with someone who made such vehement racial comments regarding Complainant. The investigation was unable to resolve specifically when the car ride between Mr. Hall and Mr. Humlen occurred, when Mr. Hall complained to Mr. Sessions, and whether these events occurred before or after Complainant expressed his satisfaction with the handling of his complaints to Mr. Sessions. Nevertheless, Respondent does not dispute that it chose to take no action regarding this incident.

When Complainant notified Respondent of Mr. Hazlett's report that Mr. Humlen called Complainant a "nigger," Respondent, again, did not take serious action. This is puzzling since, according to Mr. Sessions, use of the "N-word" is "extremely inappropriate," and that is why Mr. Hawkins received more serious discipline for use of the term. Here, there was an allegation that Mr. Humlen used the term "nigger" as a racial epithet to describe Complainant, and did so at the workplace during working hours. According to Mr. Sessions, at minimum, such a statement would violate Respondent's anti-discrimination policy.[14]   Respondent's assertion that the conversation allegedly took place "outside on the stairs" of Respondent, and that the comment was made to a non-employee of Respondent, is not compelling. Further, although Complainant no longer worked at the location where the comment was made, Complainant still worked for Respondent. The comment was brought to Complainant's attention, he contacted Respondent's Human Resources Officer, and nothing more was done other than Mr. Humlen being told that the comment would be unacceptable if it was made. Although Mr. Humlen denied making the statement, Respondent did not conduct an investigation into whether evidence existed that Mr. Humlen actually used the word. Respondent asserts that it was second-hand information from Complainant. However, Respondent did not contact Mr. Hazlett in an attempt to verify what occurred. Mr. Hazlett states that he returned to Respondent a couple of weeks after the incident.

---

[14] Respondent's Employee Handbook contains a section on sexual harassment, but does not contain any other sections regarding discrimination. The most relevant section appears to be the Disciplinary Action section, which states that "[m]aking malicious, false or derogatory statements that could reasonably result in damage to the integrity of the company and/or its employees" and "[o]ther acts inconsistent with reasonable standards of employee conduct with [sic] might reflect negatively on the company and the community standards it represents" are:

> [s]ubject to any of the following disciplinary procedures based on the severity of the offense and the judgment of the supervisor and his or her direct manager: reprimands, oral and/or written, suspension for a specified period of time or dismissal. These occurrences may accumulate from the same of [sic] different offenses. When disciplinary action is required, a written notice will be placed in the employee's personnel file. This notice will state the nature of the offense, the date it occurred, and will be signed by both the employee and the supervisor.

An act that is considered "gross negligence or willful, serious misconduct" is listed as an example of conduct that may result in disciplinary action or termination.

The final sentence of the sexual harassment section states, "We trust that all employees of the company should act in a responsible fashion, and provide for a pleasant work environment that is free form [sic] all types of discrimination."

EXHIBIT 3

Respondent had the opportunity to speak with Mr. Hazlett regarding the matter at that time as well, but did not. Respondent's response was insufficient.

Although Complainant did not allege any complaints between the end of January and mid-March, 2012, when the incident with Mr. Hazlett occurred Complainant notified Respondent, but Respondent did not take appropriate action. Respondent had a duty to ensure that the discriminatory comments stop, but failed to investigate and take immediate and appropriate corrective action at the time they were reported. A single use of the "N word" can be sufficiently severe to create a hostile work environment.[15] In this case, in addition to a complaint by Complainant that Mr. Humlen had used that word to describe him at Respondent's workplace, Respondent had previous notice from a different employee that Mr. Humlen had made discriminatory, racist comments regarding Complainant. Respondent chose not to act regarding that incident, and then failed to take appropriate action when another incident occurred. The situation was sufficiently severe to alter the conditions of Complainant's employment and create an abusive work environment.

Given this evidence, the Commission finds **probable cause** to believe that illegal racial discrimination has occurred. A staff member will be in contact with the parties to attempt resolution of the probable cause finding.


_____4/19/2013_____          _Pamela Parks_
Date                         Pamela Parks, Administrator
                             On behalf of the Commission

nh

---

[15] See Equal Employment Opportunity Commission (EEOC) Compliance Manual, Section 15, VII(2).

15 – Savage vs. Dennis Dillon Auto Park & Truck Center, Inc.

EXHIBIT 3