## IN THE UNITED STATES DISTRICT COURT FOR THE STATE OF IDAHO

| | |
|---|---|
| **DANIEL SAVAGE,** | **Case No. 1:14-CV-00123-EJL-CWD** |
| *Plaintiff,* | |
| | **MEMORANDUM DECISION AND ORDER** |
| **v.** | |
| **Dennis Dillon Auto Park & Truck Center, Inc., Peder Humlen,** individually, and John Does I through XX whose true identities are unknown. | |
| *Defendants.* | |

The Court has before it Defendants' Motion for Summary Judgment (Dkt. 19) and Plaintiff's Motion for Partial Summary Judgment (Dkt. 22). The parties have submitted their briefing on the motions and the matter is now ripe for the Court's review. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motions shall be decided on the record before this Court without oral argument.

For the reasons stated below, the Court finds there are disputed issues of material fact which preclude granting summary judgment for either party with respect to Plaintiff's hostile work environment and Idaho Human Rights Act

claims.  As will be further explained, the cross-motions for summary judgment are both granted in part and denied in part.

## FACTUAL BACKGROUND

On March 28, 2014, Plaintiff Daniel Savage ("Savage") brought this action against Defendant Dennis Dillon Auto Park & Truck Center, Inc. ("Dennis Dillon"), and employees of Dennis Dillon Peder Humlen ("Humlen"), Roy Baxter ("Baxter") and Lee Hawkins ("Hawkins").[1]  Savage alleges racial discrimination under Title VII of the Civil Rights Act, violation of the Idaho Human Rights Act, and various state tort claims arising out of his employment as a car salesman for Dennis Dillon between December 2011 and May 2012.[2]  Savage claims Humlen, Baxter and Hawkins made racially derogatory, disparaging and contemptuous remarks about him based on his African American descent, and that Dennis Dillon unreasonably failed to take appropriate corrective action.

During Savage's time at Dennis Dillon's Kia location, he was subjected to a number of racial insults from fellow car salesmen Humlen, Baxter and Hawkins.  Such comments started shortly after Savage began working for Dennis Dillon Kia in December 2011.  First, one day when Humlen wore a novelty tie to work, Savage asked Humlen

---

[1] Baxter and Hawkins were later dismissed as defendants by stipulation of the parties.  (Dkt. 29.)

[2] Savage also worked for Dennis Dillon between October 2008 and April 2009 and between November 2009 and May 2010.  (Dkt. 19-1, ¶ 1.)  Only the time period of Savage's latest employment, between December 2011 and May 2012, is relevant to this suit.  Savage worked as a car salesman for Dennis Dillon at its Kia location from December 2011, until he transferred to Dennis Dillon's Nissan location on March 9, 2012.   Savage left his employment with Dennis Dillon Nissan in May 2012.

what was pictured on his tie.  Humlen responded, "A spook, just like you."  (Dkt. 24, Exhibit G, Deposition of Plaintiff Daniel Savage, p. 104, ll. 22-25) (hereinafter *Savage Deposition*).  Savage questioned, "Excuse me, what did you just say?" and Humlen replied, "You heard me."  (*Id.*)  Humlen admits he told Savage his tie pictured a "spook," but contends he made this comment only because the tie had pictures of ghosts on it.  Humlen suggests his "spook" comment was not racially motivated, and denies he added "like you" when he told Savage his tie pictured a "spook."  (Dkt. 21, Exhibit A, Affidavit of Peder Humlen in Response to Charge of Discrimination, ¶ 5) (hereinafter *Humlen Affidavit*); Dkt. 21, Exhibit C, Affidavit of Jason Erickson in Response to Charge of Discrimination, ¶ 2) (hereinafter *Erickson Affidavit*).  Savage felt the "spook" comment was meant as a derogatory way to describe an African American male, and was offended by the term.  (Dkt. 24, *Savage Deposition*, p. 108, ll. 15-25, p. 109, ll. 1-11.)

Later, also in December 2011, Humlen and Savage had a verbal confrontation.  During this confrontation, Humlen told Savage, "You know, Dan, you're nothing but a mammy."  (*Id.*, p. 109, ll. 21-24.)  Humlen also admits he called Savage a "mammy," but states he meant "a weak or girly individual" when using this term.  (Dkt. 21, *Humlen Affidavit*, ¶ 6.)  Humlen contends he made the comment because Savage had made an inappropriate comment regarding Humlen's wife.  (*Id.*)  Savage believed the term "mammy" referred to an African American woman and asked Humlen, "Why are you saying all of these racial things towards me?"  (Dkt. 24, p. 112, 1-8.)  Savage contends Humlen responded, "Because I can."  (*Id.*)

Savage reported both the "spook" and "mammy" comments to Dennis Dillon management.  In response, Dennis Dillon management had meetings with Savage and Humlen and directed them to keep their personal feelings about each other out of the workplace.  (*Id.*, p. 114, ll. 8-16.)  Humlen was also given a verbal reprimand for the "spook" comment.  (Dkt. 21, *Erickson Affidavit*, ¶ 2.)  After the discussion with management, Humlen apologized to Savage.  (Dkt. 24, *Savage Deposition*, p. 115, ll. 10-13.)

In early January, 2012, Baxter called to Savage while the two were in the showroom, "Hey, Dan, if I throw this banana on the ground, would you pick it up?"  (*Id.*, p. 116, ll. 21-25.)  Savage interpreted Baxter's banana reference as comparing Savage as an African American to a gorilla or ape who eats bananas.  (*Id.*, p. 117, ll. 14-24.)  Baxter later told Savage, on two occasions, "Hey Dan, we know that black is beautiful, but white is superior."  (*Id.*, p. 120, ll. 12-25, p. 121, ll. 1-15.)  Baxter also told Savage in early January, "I do not know how black people sell cars, but we white people sell them this way."  (*Id.*, p. 125, 1-3.)  In addition, Baxter referred to Savage as "boy" several times in January.  (*Id.*, p. 126, ll. 3-17.)  When Savage protested, Baxter purportedly responded, "Listen, boy, I was just playing and that is how we talk where I come from."  (Dkt. 1, ¶ 33.)  Savage reported Baxter's comments to Dennis Dillon management.  Baxter was

written up and received a one-day suspension for his conduct.  (Dkt. 24, *Savage Deposition*, p. 127, ll. 8-11.)  Baxter later apologized to Savage.[3]  (*Id.*, p. 128, ll. 11-12.)

Another incident occurred in January 2012 involving Hawkins.  One day, in front of everyone on the showroom floor, including Savage, Hawkins questioned, "Hey, guys, how come I can't use the word 'nigger?'"  (Dkt. 1, ¶ 35.)  Savage took offense to the use of this word and told Hawkins, "I can't believe you just said that."  (Dkt. 24, *Savage Deposition*, p. 129, ll. 6-7.)  Savage reported Hawkins' comment to Dennis Dillon management and Hawkins, like Baxter, received a one-day suspension and write-up.[4] (*Id.*, ll. 21-25.)

In addition to suspending Baxter and Hawkins, Dennis Dillon conducted an anti-discrimination training on January 18, 2012.  (*Id.*, p. 140, ll. 8-25.)  During the training, management reviewed company policy stating discrimination would not be tolerated. (*Id.*)  Management also followed up with Savage after the training and asked if he would like to transfer to another Dennis Dillon sales lot across the street in order to avoid

---

[3] Baxter admitted to making the aforementioned comments but stated they were made in jest and that he never meant to offend Savage.  (Dkt. 21, Exhibit E, Affidavit of Roy Baxter in Response to Charge of Discrimination, ¶¶ 3-4) (hereinafter *Baxter Affidavit*).  Baxter claims Savage often participated in racial humor, sometimes referring to white people as "hillbillies" or "white trash."  (*Id.*, ¶ 3.)

[4] Hawkins stated this comment was meant because he legitimately wondered why black people used the term "nigger" freely but white people could not.  (Dkt. 21, Exhibit B, Affidavit of Lee Hawkins in Response to Charge of Discrimination, ¶ 5) (hereinafter *Hawkins Affidavit*).  Hawkins said he did not intend to offend Savage, but admitted his comment was likely inappropriate.  (*Id.*)  Like Baxter, Hawkins also noted there was a lot of joking and teasing going on between all sales consultants at the dealership, and claimed Savage often participated in such banter.  (*Id.*, ¶¶ 3-4.)

working with Humlen, Baxter and Hawkins.  (*Id.*, pp. 142-143.)  Savage declined the

offer to transfer.  Savage stated he did not want to transfer because he knew Kias well

and didn't believe he could make high sales across the street where Dennis Dillon sold

GMCs, which he did not have experience with.  (*Id.*, p. 144, ll. 4-9.)

Towards the end of January, 2012, another co-worker, Clayton Hall ("Hall"),

notified Savage that Humlen had told him something to the effect of, if Savage did not

have a family, Humlen would hurt or kill him, and that Humlen wished all black people

were dead.  (Dkt. 22-2, Exhibit 2, Idaho Human Rights Commission Probable Cause

determination, p. 21) (hereinafter "Commission Report").  Humlen's comments to Hall

were made while Humlen gave Hall a ride home from Dennis Dillon's expo sale at the

Idaho State Fairgrounds.  At the time Humlen allegedly made such statement to Hall,

Savage was the only African American employee at the Dennis Dillon Kia lot.  (Dkt. 1,

¶ 39.)  Savage did not report the incident to management because Hall advised him that

he would report Humlen's comments.  (*Id.*, p. 134, ll. 13-17.)

Hall notified his supervisor, Mike Booher ("Booher") of Humlen's comments, and

told Booher he did not want to work with Humlen since he was a racist.  (Dkt. 22-2,

*Commission Report*, p. 21.)  Because Booher did not appear to do anything about the

situation, Hall then notified Dennis Dillon CFO Duane Sessions ("Sessions") about

Humlen's comments.  Neither Booher nor Sessions ever got back to Hall about his report.

(*Id.*)  However, Hall told Idaho Human Rights Commission investigator Sara Mae Fisher

that he openly told Humlen several times, around other coworkers, that his comments

were uncalled for.  Hall also stated he spoke to other coworkers about Humlen's

6

comments, and was fairly certain Dennis Dillon manager Jason Erickson knew about them since the incident had been openly discussed at the dealership.[5]  (*Id*.)

After the aforementioned comments from Humlen, Baxter and Hawkins, Savage continued to work at the Kia lot without incident until March 7, 2012.[6]  On that date Savage overheard Baxter and Hawkins talking about "how fat and lazy" Mexican women were.  (Dkt. 24, *Savage Deposition*, p. 152, ll. 23-25.)  Savage viewed this comment as "the last straw" and requested a transfer to another lot.  (*Id*., p. 153, ll. 1-2.)  Savage did not advise management about the reason for his request, and did not report Baxter and Hawkins' comments about Mexican women.  (*Id*., ll. 3-13, p. 154, ll. 8-13.)

Savage was transferred to Dennis Dillon's Nissan lot and worked there briefly between March and May, 2012.  On March 13, 2012, Savage was contacted by Steve Hazlett ("Hazlett"), a friend of his who had previously worked with both Savage and Humlen at another dealership.  (Dkt. 22-4, ¶ 25.)  Hazlett informed Savage that he just had gone to the Kia dealership to inquire about a job.  (Dkt. 32, Declaration of Stephen Hazlett, ¶¶ 2-3) (hereinafter *Hazlett Declaration*).  As Hazlett was leaving, Humlen approached him and initiated a conversation about Savage.  Humlen proceeded to tell

---

[5] The Commission Report states Sessions verified Hall told him about Humlen's comments, but that Sessions didn't feel he could do anything about them since they had occurred outside of work.  (*Id*., p. 19.)

[6] Although Savage was not subjected to any racial epithets during this time, he noted in his deposition that the atmosphere at work between January and March, 2012 was "toxic" due to Humlen's feelings toward Savage and the past racial comments by his co-workers.  (Dkt. 24, *Savage Deposition*, p. 157, ll. 2-25.)

Hazlett that he had referred to Savage as a "nigger" on the showroom floor of the Kia dealership in order to goad Savage into a fight.  (*Id*., ¶ 5.)  Hazlett was offended by Humlen's statement and called Savage to relay Humlen's comment.  (*Id*., ¶ 7.)  Savage reported the incident to Dennis Dillon management.  On March 16, 2012, Sessions and human resource coordinator Tina Adams met with Humlen regarding his conversation with Hazlett.  (Dkt. 22-4, ¶ 27.)  Humlen denied making the comments to Hazlett, and no further disciplinary action was taken.  (Dkt. 22-4, ¶¶ 29-30.)

As a result of the aforementioned incident with Humlen and the harassment he had suffered at Dennis Dillon's Kia lot, Savage felt "shaken," had difficulty making any sales, and felt his spirit "was just broken." (*Id*., p. 159, ll. 14-16, p. 161, ll. 14-19.) Savage felt completely "unprotected" by management, and believed Humlen may attempt to kill him.  (*Id*., p. 166, ll. 13-22.)  Savage saw a counselor for depression and cardiologist for severe chest pains he associated with the emotional distress caused by the defendants.  (Dkt. 1, ¶¶ 59-63; Dkt. 24.)  In May 2012, Savage felt forced to quit his job with Dennis Dillon due to his declining mental and physical health.  (Dkt. 1, ¶ 64; Dkt. 22-2, ¶ 34.)   After brief stints with other dealerships, Savage has been unable to return to work due to his ongoing depression.

After resigning in May 2012, Savage submitted a Charge of Discrimination to the Idaho Human Rights Commission ("IHRC") alleging discrimination based on race.  (Dkt. 22-2, Exhibit 1.)  On April 19, 2013, the IHRC issued a decision finding probable cause to believe that illegal racial discrimination had occurred in Savage's case.  (*Id*., Exhibit 2, *Commission Report*.)   On January 8, 2014, the IHRC issued a Notice of Right to Sue

based on its report. (*Id.*, Exhibit 3.)  The United States Equal Employment Opportunity Commission issued a Notice of Right to Sue on January 16, 2014.  (*Id.*, Exhibit 4.) Savage thereafter filed the instant suit.[7]

On June 25, 2015, the parties filed cross-motions for summary judgment. Defendants seek summary judgment on each of Savage's claims, while Savage seeks partial summary judgment on his causes of action against Defendants for violation of Title VII (hereinafter "hostile work environment claim") and violation of the Idaho Human Rights Act ("IHRA").  (Dkts. 20; 21.)  Savage also seeks summary judgment holding his causes of action for emotional distress accrued on or after May 5, 2012, and asks the Court to dismiss several of Defendants' affirmative defenses.

## STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  Rule 56 provides that judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  According to Rule 56, an issue must be both "material" and "genuine" to preclude entry of summary judgment. An issue is "material" if it affects the outcome of the litigation.  *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975).  That is, a material fact is one that is relevant to an element of a claim or

---

[7] Savage also filed a similar case in Idaho state court, Ada County Case No. CV-OC 13-21598.  (Dkt. 22-2, Declaration of Breck Seiniger, Jr. in Support of Plaintiff's Motion for Partial Summary Judgment, ¶ 6) (hereinafter *Seiniger Declaration*.)  The state court case has been stayed pending resolution of this proceeding.  (*Id.*)

defense which might affect the outcome of the suit. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id*.

An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn*, 523 F.2d at 464 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Because factual disputes are to be resolved at trial, in ruling on summary judgment motions, the Court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contactors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Moreover, all inferences must be drawn in the light most favorable to the nonmoving party. *Id*. at 631. To deny a motion for summary judgment, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law. *Aronsen v. Crown Zellerbach*, 662 F.2d 584, 591 (9th Cir. 1981).

Finally, where, as here, the parties both move for summary judgment, the Court will consider each motion on its own merits. *Fair Housing Council of Riverside Cnty. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). In ruling on cross-motions, the Court will consider the entirety of each party's evidentiary submission, regardless of which motion (or opposition) the evidence accompanied. *Id*. at 1136-37.

## ANALYSIS

### 1. Admissibility of Commission Report

As an initial matter, Defendants challenge the admissibility of the Commission Report by the IHRC, and suggest that because the Commission Report determined there was discrimination (rather than merely probable cause of discrimination) it should not be admissible due to the risk of unfair prejudice.  (Dkt. 33, pp. 1-3.)  Defendants contend the Commission Report also lacks the necessary trustworthiness needed for admissibility because the IHRC failed to interview Humlen.  (*Id*., p. 2.)  Defendants further argue the conclusions in the Commission Report do not create a genuine issue of material fact, and suggest the factual conclusions contained in the report that are based on hearsay are not admissible.  (*Id*.)  Savage responds that the Commission Report is excepted from the hearsay rule under Federal Rule of Evidence 803(8)(iii) (hearsay exception for "a record or statement of a public office if…it sets out…factual findings from a legally authorized investigation.").  (Dkt. 31, p. 2.)  Savage also cites several cases allowing the admission of an EEOC or other impartial agency, such as the IHRC, determination in a Title VII lawsuit.  (*Id*.)

In *Plummer v. Western Int'l Hotels Co*., 656 F.2d 502, 505 (9th Cir. 1981), the Ninth Circuit held that a plaintiff has a "right to introduce an EEOC probable cause determination in a Title VII lawsuit, regardless of what other claims are asserted, or whether the case is tried before a judge or jury."  The Ninth Circuit later indicated "the *Plummer* ruling is not restricted solely to EEOC findings of probable cause but extends to similar administrative determinations…."  *Heyne v. Caruso*, 69 F.3d 1475, 1483 (9th Cir. 1995).  Although Defendants argue *Plummer* does not apply because here the Commission Report determined there was discrimination, rather than simply probable

11

cause of discrimination, the Court is not persuaded that the prejudicial effect of the probable-cause determination outweighs its probative value for purposes of summary judgment.[8]  Nor does the fact that the IHRC failed to investigate Humlen require exclusion of the Commission Report at this stage.  Further, the Court does not find the legal conclusions in the Commission Report create a genuine issue of material fact.  The Court instead finds genuine issues of material fact are established by all of the evidence in the record, including the deposition of Savage and the declarations of each Defendant.  Finally, the hearsay allegations contained in the Commission Report may be admissible at under Federal Rule of Evidence 803(8)(iii).  The Court will consider the Commission Report for purposes of summary judgment.

## 2.   Hostile Work Environment Claim

Under Title VII, it is "an unlawful employment practice for an employer to fail or refuse to fire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII's prohibition not only applies to situations with tangible or economic discrimination, but also to situations where racial or other harassment is so severe or pervasive that it alters the conditions of the plaintiff's employment and creates a hostile work environment.  *Faragher v. City of Boca Raton*,

---

[8] The Court makes no finding with respect to admissibility of the Commission Report at trial.

524 U.S. 775, 786 (1998).  In order to establish a successful hostile work environment

claim, Savage must show that: (1) he was subjected to verbal or physical abuse of a racial

nature; (2) this conduct was unwelcome; (3) the conduct was sufficiently severe or

pervasive to alter the conditions of his employment and create an abusive working

environment; and (4) Dennis Dillon failed to take adequate remedial and disciplinary

action.  *Ellison v. Brady*, 924 F.2d 872, 875-76 (9th Cir. 1991); *McGinest v. GTE Serv.*

*Corp*., 360 F.3d 1103, 1112 (9th Cir. 2004).

      a.   *Subjective and Objective Hostile Environment*

      To be actionable, a hostile work environment must be found to be "both

subjectively and objectively offensive, one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so."  *Faragher*, 524 U.S. at

787.  To determine whether the work environment was objectively hostile or abusive,

courts are directed to look at the totality of the circumstances of each case, including "the

frequency of the discriminatory conduct; its severity, whether it is physically threatening

or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

an employee's work performance."  *Harris v. Forklift Sys.*, *Inc*., 510 U.S. 17, 23 (1993).

Simple teasing, comments and isolated incidents, unless extremely serious, will not

amount to a hostile work environment.  *Faragher*, 524 U.S. at 788.  Title VII is not

designed to be a "general civility code."  *Id*.  As such, conduct must be extreme in order

to amount to a change in the terms and conditions of employment.  *Id*.  However,

harassment need not be severe enough to cause diagnosed psychological injury.  *Harris*,

510 U.S. at 22.  It is enough "if such hostile conduct pollutes the victim's workplace,"

making it more difficult for him to do his job, take pride in his work, and to desire to stay in his position.  *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). Thus, an inquiry into the objective severity of harassment "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target… The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."  *Oncole v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 82 (1998); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (stressing workplace conduct "is not measured in isolation" and the need to consider all circumstances in hostile work environment cases).

Undoubtedly, Savage was subjectively offended by the comments made by Humlen, Baxter and Hawkins.  Savage reported Humlen's "spook" and "mammy" comment to management, as well as the numerous racially offensive "jokes" made by Baxter, and Hawkins' comment using the word "nigger."  Savage also suffered depression and heart issues he perceived to have been caused by the harassment at Dennis Dillon, sought mental health treatment for depression, felt forced to transfer to another car lot to avoid his harassers, and ultimately quit because he could no longer successfully work through his depression.  Subjective hostility is clearly established in this case through Savage's testimony and his complaints to supervisors and the IHRC.  *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864, 873 (9th Cir. 2001).

To establish an objectively hostile work environment, the required showing of severity or seriousness of harassing conduct varies inversely with the pervasiveness or

frequency of the conduct. *Ellison*, 924 F.2d at 878 (citing *King v. Board of Regents of the Univ. of Wisconsin Sys.*, 898 F.2d 533, 537 (7th Cir. 1990) ("[a]lthough a single act can be enough, … generally, repeated incidents create a stronger claim of hostile environment, with the strength of the claim depending on the number of incidents and the intensity of each incident.") In addition, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position. *Ellison*, 924 F.2d at 872. In *McGinest*, 360 F.3d at 1115, the Ninth Circuit held "allegations of a racially hostile workplace must be assessed from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff." In so holding, the Court explained:

> Racially motivated comments or actions may appear innocent or only mildly offensive to one who is not a member of the targeted group, but in reality be intolerably abusive or threatening when understood from the perspective of a plaintiff who is a member of the targeted group. The omnipresence of race-based attitudes and experiences in the lives of black Americans may cause even nonviolent events to be interpreted as degrading, threatening, and offensive…. By considering both the existence and the severity of discrimination from the perspective of a reasonable person of the plaintiff's race, we recognize forms of discrimination that are real and hurtful, and yet may be overlooked if considered solely from the perspective of an adjudicator belonging to a different group than the plaintiff.

*Id*. at 1116 (internal quotation marks, citations and brackets omitted).

Savage has identified multiple offensive comments made by Humlen, Baxter and Hawkins which created a racially hostile work environment. Because Defendants dispute whether many of the comments are either admissible or can be considered objectively discriminatory, the Court addresses each incident in turn.

The first time Savage believed he was subject to racial discrimination occurred shortly after he began working for Dennis Dillon in December 2011.  During this month, Humlen referred to Savage as both a "spook" and a "mammy."  Defendants contend there is no evidence such comments were objectively discriminatory because Humlen claims he referenced the word "spook" to describe the "scary ghost or creature" pictured on his tie, and did not intend a racial insult.  (Dkt. 21, *Humlen Affidavit*, ¶ 5.)  Humlen also insists he meant to infer "a weak or girly individual" when he called Savage a "mammy." (*Id.*, ¶ 6.)  Humlen states his comments "had nothing to do with race and my dislike of Mr. Savage had nothing to do with the color of his skin.  Rather, I frankly though Mr. Savage was offensive and mean-spirited as a co-worker."  (*Id.*, ¶ 7.)  Regardless of Humlen's purported intent, the reasonable victim standard classifies conduct as unlawful racial harassment "even when harassers do not realize that their conduct creates a hostile work environment."  *Ellison*, 924 F.2d at 880.[9]  "Title VII is aimed at the consequences or effects of an employment practice and not at the…motivation of co-workers or employers."  *Id.* (citation omitted).  Thus, the absence of discriminatory intent does not redeem an otherwise unlawful employment practice.  *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971).  Here, Savage clearly perceived Humlen's comments to be racially

---

[9] Although *Ellison* involved sexual harassment, the Supreme Court has held hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n. 10 (2002).  The Ninth Circuit extended the *Ellison* analysis regarding objective hostility to claims of racial harassment in *McGinest*, 360 F.3d at 1115-16.

motivated, as he both asked Humlen why he was making racial insults towards him and reported Humlen to management for making such comments.  Moreover, while "spook" and "mammy" may have innocuous definitions, as Defendants contend, both are also defined as racial epithets.[10]  The Court will thus consider Humlen's "spook" and "mammy" comments to be objectively racial insults.

Following Humlen's December comments, Savage endured a number of racially-motivated insults and comments from Baxter and Hawkins in January 2012.  Savage perceived and the Court finds Baxter's question as to whether Savage would pick up a banana off the floor to be racially motivated.  Baxter's repeated statement regarding white "being superior," referring to Savage as "boy,"[11] and Hawkins' use of the word "nigger"[12] in the workplace were also clearly racially motivated and derogatory.

---

[10] *Compare*, http://www.meriam-webster.com/dictionary/spook (defining "spook" as "a ghost or spector, or a  spy") *with* http://www.urbandictionary.com/define.php?term=spook (defining "spook" as "A derogatory slur for a person of African descent."); see also http://merriam-webster.com/dictionary/mammy (defining "mammy" as both "mama" and "a black woman serving as a burse to white children especially formerly in the Southern United States.").

[11] Defendants suggest Baxter's comments were mere jokes, that Savage often participated in jokes involving racial stereotyping, and detail an incident where Savage purportedly referred to Hawkins as "boy."  Savage denies each allegation.  Whether Savage participated in mere racial "banter" is thus a disputed issue of material fact.  Further, in complaining to Dennis Dillon management about Baxter's conduct, Savage demonstrated a subjective belief that he was being harassed.  *Nichols*, 256 F. 3d at 874.

[12] "It is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination.  This word is 'perhaps the most offensive and inflammatory racial slur in English,… a word (Continued)

Although Baxter and Hawkins are no longer defendants in this suit, the Court finds Baxter's and Hawkins' comments relevant to the totality of the circumstances in this case.

Next, Savage learned from Hall in late January 2012 that Humlen had either stated he wanted to "kill all the niggers who worked at Dennis Dillon" or that he wished "all Black people were dead" and that if Savage didn't have a family, Humlen would hurt or kill him.  (Dkt. 1, ¶ 39; Dkt. 22-2, p. 21.)  Defendants contend Humlen's alleged statements to Hall are irrelevant because they were made off-duty and outside of Savage's presence.  However, remarks made outside a plaintiff's presence can be relevant to a hostile work environment claim.  *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001); *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (reversing district court's grant of summary judgment for defendant employer where court failed to consider statements that occurred outside of plaintiff's presence as a part of the totality of the circumstances).  Further, harassment does not have to take place within the physical confines of the workplace to be actionable under Title VII, it need only have consequences in the workplace.  *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008).  Here, Savage stated that once he learned of Humlen's comments to Hall he feared for his life and believed Humlen may bring a gun to work.  (Dkt. 24, *Savage Deposition*,

---

expressive of racial hatred and bigotry.'"  *McGinest*, 360 F.3d at 1116 (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001)).

pp. 166-167.)  Savage's work environment clearly deteriorated as a result of learning

about Humlen's comments to Hall.

Although Defendants cite numerous cases finding employers are generally not

responsible for hostile acts resulting from off-duty interactions between employees, such

cases are either distinguishable or imply off-duty conduct is relevant to the hostile work

environment claim if it has consequences in the workplace.  *See, e.g., Candelore v. Clark*

*Cnty. Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) (alleged sexual misconduct did

not involve plaintiff and was not so egregious as to render plaintiff's work environment

hostile); *Sprague v. Thorn Americas, Inc*., 129 F.3d 1355, 1366 (10th Cir. 1997)

(discounting single incident of harassment which occurred outside of work where

incidents which occurred at work were spread out over a long period of time and could be

considered boorish and unpleasant but not hostile or abusive); *Gowesky v. Singing River*

*Hosp. Sys.*, 321 F.3d 503, 510 (5th Cir. 2003) ("[A] harassment claim, to be cognizable,

must affect a person's working environment."); *Bodman v. Maine Dept. of Health and*

*Human Services*, 787 F.Supp.2d 89, 102 (D. Maine, 2011) (granting summary judgment

where plaintiff made no effort to identify facts from which the court could infer a

connection between defendant's alleged hostile conduct and plaintiff's employment);

*Fontenot v. Buus*, 370 F.Supp.2d 512, 518 (W.D.La. 2004) (where only harassment in

work was "leering," defendant's conduct which occurred outside the workplace, away

from any witnesses, would not be considered); *Ferris  v. Delta Air Lines, Inc*., 277 F.3d

128, 137 (2d Cir. 2001) (fact that conduct was off-duty and off-premises did not absolve

employer of all responsibility to take reasonable care to protect co-workers where

employer had notice of such conduct).  The cases Defendants cites may control if Humlen's statements to Hall had been the only harassing conduct at issue.  Instead, Humlen's off-duty statements to Hall supplement the in-work statements Humlen, Baxter and Hawkins made to Savage.  The Court considers Humlen's statements to Hall within the totality of the circumstances of Savage's hostile work environment claim.

Defendants also argue Humlen's statements to Hall are inadmissible hearsay.  However, there is ample evidence in the record to suggest Humlen in fact made the statements and that Dennis Dillon management was aware of them.  Hall reported Humlen's statements to both Booher and Sessions, and also repeated Humlen's statements to the IHRC investigator.  (Dkt. 22-2, *Commission Report*, pp. 19-21.)  The Commission Report details Hall's claims regarding Humlen's statement.  Further, Sessions reported he was concerned enough about Humlen's conduct to contact legal counsel, but came to the conclusion there was nothing to do because the comment was made off business premises (*Id.*, p. 19.)  Savage was told that such comments had been made, and knew that management had learned of the purported statements and taken no disciplinary action.  Such knowledge is relevant to Savage's claim of a hostile work environment.  Regardless of whether actionable in and of itself, Humlen's comment to Hall serves as relevant background evidence to put Savage's hostile work environment claim in context.  Further, both Humlen and Hall may testify at trial.  The jury will have the opportunity to weigh their testimony and determine which is more credible.  Thus, Humlen's statements to Hall could be admitted into evidence at trial in a variety of ways,

and the Court considers such statements relevant for purposes of summary judgment.[13] *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).

Defendants also suggest Baxter and Hawkins' comment regarding Mexican women being "fat and lazy" is irrelevant because it was not directed at Savage.  The Ninth Circuit has held otherwise, as a plaintiff may establish a violation of Title VII if racial hostility pervades the workplace, even if such hostility is not targeted at the plaintiff.  *McGinest*, 360 F.3d at 1117 (citing *Woods v. Graphic Communications*, 925 F.2d 1195, 1202 (9th Cir. 2001)).  An employee has a right, under Title VII, "to work in an environment free from discriminatory intimidation, ridicule, and insult."  *Meritor Sav. Bank, FSB v. Vinsin*, 477 U.S. 57, 65 (1986).  Even if Baxter and Hawkins' comment regarding Mexican woman was not directed at Savage personally, such statement was far from an isolated incident, and contributed to creating a racially hostile environment.  *Woods*, 925 F.2d at 1202 (holding that environment was "polluted" with racial hostility where plaintiff was surrounded by racial insults and subjected directly to some of them); *Stingley v. State of Arizona*, 796 F.Supp. 424, 428 (D. Arizona 1992) (finding racial and sexual harassment based in part on use of racist nicknames and slurs about another worker in the presence of plaintiff).  The Court thus considers the "Mexican women" comment relevant to Savage's hostile work environment claim.

---

[13] Defendants also object to admission of the statements Humlen purportedly made to Hazlett as inadmissible hearsay.  This objection is moot in light of the affidavit of Hazlett, filed after Defendants submitted their reply.  (Dkt. 32; Dkt. 38.)

Finally, Defendants contend Humlen's statements to Hazlett in March 2012 cannot be considered because they were made outside of Savage's presence.   As noted, the Second Circuit has held that comments made outside a plaintiff's presence can be relevant to a hostile work environment claim.  *Leibovitz*, 252 F.3d at 190.  The Ninth Circuit also implied conduct that occurred outside of a plaintiff's presence was relevant to a hostile work environment claim in *Draper v. Coeur Rochester, Inc*., 147 F.3d 1104 (9th Cir. 1998).  In addition to other harassment, the *Draper* Court noted defendant employer, "Annelli," made frequent comments about plaintiff to her coworkers outside plaintiff's presence, and that Annelli called plaintiff's supervisor and derisively and mockingly laughed in response to plaintiff's claims of harassment.  *Id*. at 1105, 1107.  With respect to the latter incident, the Court held "Annelli's confidence that he could call his supervisor and ridicule [plaintiff's] concerns understandably suggested to [plaintiff] that his earlier meetings with Coeur's management had no effect on Annelli's behavior, that he would continue to treat her in the same manner as before, and that the chances that management would take appropriate action were slim to none."  *Id*. at 1109.  Similarly, Humlen's confidence that he could refer to Savage as a "nigger" to a prospective employee of Dennis Dillon while on Dennis Dillon's premises, despite receiving a previous verbal reprimand for harassing Savage, as well as the fact that Dennis Dillon again failed to take any disciplinary action against Humlen, supports Savage's hostile environment claim.  The comments by Humlen to Hazlett cannot only be considered a final hostile act by Humlen, but also served "as a sharp reminder to [Savage] of all that had already occurred and all that could be expected in the future."  *Id*.

In sum, the Court finds each of the incidents recounted by Savage in support of his hostile work environment claim to be relevant and sufficient to create genuine issues of material fact as to whether Savage's perception of a hostile work environment was objectively reasonable.  The Court cannot, however, go further and determine Savage has established a hostile work environment as a matter of law.  First, several of the incidents detailed above are disputed.  Humlen, for example, claims he did not add "like you," when he told Savage his tie pictured a "spook."  Humlen also denies that he told Hall he wanted to hurt or kill Savage and wished that all black people were dead, and denies he referred to Savage as a "nigger" to Hazlett.  Baxter and Hawkins also claim their comments were made in jest and that Savage participated in racial jokes and banter.  *See Steiner v. Showboat Operating Co*., 25 F.3d 1459, 1464 n. 5 (9th Cir. 1994) (noting possibility that an employee who regularly subjects co-workers to discriminatory language may effectively invite them to respond in kind); *Faragher*, 524 U.S. at 788 ("Simple teasing" will not generally constitute a hostile work environment); *Nichols*, 256 F.3d at 873 (mutual "horseplay" was properly excluded from hostile work environment claim).  As each instance of abuse is relevant to and enhances the probability of finding an objectively hostile work environment, the jury will need to hear testimony from Humlen and others and make corresponding credibility determinations.  At this stage of the litigation, the Court may not weigh conflicting evidence with respect to disputed material facts.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  Nor may the Court make credibility determinations, as "the weighing of the evidence, and the drawing

23

of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Id*.

Second, even when assuming each instance of discrimination as recounted by Savage occurred, whether the conduct was objectively so pervasive or severe as to alter the conditions or terms of the work environment is not entirely clear. In comparison to many hostile work environment cases, the conduct here was not nearly as severe as pervasive. For instance, in *Faragher*, 524 U.S. at 781, the Supreme Court determined female plaintiff suffered a "sexually hostile atmosphere" where supervisors repeatedly touched her buttocks, made crudely demeaning references to women, repeatedly made sexual comments about plaintiff and her body, tackled plaintiff, simulated sexual acts in the presence of plaintiff and other women, and made threats such as, "date me or clean toilets for a year." In *Kang v. U. Lim America, Inc*., 296 F.3d 810, 814 (9th Cir. 2002), plaintiff ("Kang") and other employees of Korean descent suffered verbal abuse for up to three hours a day, and Kang also endured multiple instances of physical abuse by his supervisor, including being struck on the head with a metal ruler on approximately 20 occasions, being kicked in the shins, forced to do jumping jacks, and hit on multiple occasions with thrown objects. The Ninth Circuit held [a]fter considering all the circumstances including the frequency and severity of the conduct, the fact that the abuse was frequently 'physically threatening or humiliating' and that it unreasonably interfered with Kang's work performance, we conclude that Kang presented evidence sufficient to survive summary judgment that [defendant] subjected Kang to an objectively hostile work environment." *Id*. at 817 (citing *Nichols*, 256 F.3d at 874-75). In *McGinest*, 360

24

F.3d at 1107, plaintiff was forced to work under dangerous conditions and without proper equipment due to his race, was subjected to years of obscene and racially demeaning taunts by his supervisor and coworkers, was called a "stupid nigger" by his manager, was prevented from collecting over-time payment for over two years, and regularly encountered racist graffiti in the company restroom.  Plaintiff in *McGinest* even suffered a potentially life-threatening car accident due to management's refusal to ensure that his vehicle received proper maintenance because of plaintiff's race.  *Id.* at 1114.  Finally, in *Nichols*, 256 F.3d at 872, plaintiff endured an unrelenting barrage of verbal abuse weekly and even daily over a period of several years.  By contrast, in this case, Savage was never subject to physical abuse and, although he suffered a number of racial insults within a three-month period, some were either purportedly made in the context of workplace banter, were outside of his presence, or were not directed at Savage.

Defendants cite several cases in support of their contention that the conduct alleged here does not rise to the level held to create a hostile environment in other cases. (Dkt. 20, pp. 11-12.)  If the facts are as Defendants contend, the Court may agree. However, as repeatedly noted above, many of the facts regarding both the insults directed at Savage and whether certain comments were in fact made are in dispute.  If the facts are instead as Savage recounts them, the Court finds the cases cited by Defendants distinguishable.  For instance, in *Manatt v. Bank of Am.*, 339 F.3d 792, 798-99 (9th Cir. 2003), the Court affirmed summary judgment for defendant employer on Chinese plaintiff's hostile work environment claim where negative comments were made about individuals of Chinese descent and plaintiff was mocked for her appearance and

25

pronunciation.  However, in *Manatt*, unlike here, only two inappropriate comments were directed at plaintiff.  *Id*. at 798.  The bulk of the insults in this case were specifically aimed at Savage.  In *Vasquez v. County of Los Angeles*, 349 F.3d 634, 643 (9th Cir. 2003), the Ninth Circuit found no actionable harassment where a supervisor told plaintiff he had "a typical macho attitude," that he should consider transferring to the field because "Hispanics do good in the field," and made derogatory comments about plaintiff to others.  However, in *Vasquez*, there were only two racial insults made, both by the same individual, and the two incidents occurred more than six months apart.  By contrast, Savage endured a number of racial insults concentrated in a three month period, from three different individuals, one of whom purportedly threatened to kill him.  In *Kortan v. California Youth Auth*., 217 F.3d 1104, 1110-12 (9th Cir. 2000), the Court found plaintiff had not raised a triable issue with respect to hostile work environment where a superior referred to women as "castrating bitches," "Madonnas," or "Regina," in plaintiff's presence and called plaintiff "Medea."  Relevant to the *Kortan* Court's holding was its finding that the offensive statements were concentrated on one occasion, occurred in the wake of a dispute between defendant, plaintiff, and another employee, and, with the exception of the "Medea" comment, were all directed at other people, and not at the plaintiff.  *Id*. at 1110.  The Court explicitly found "[a]s unpleasant as [defendant's] outburst was, the comments were about other people.  He never directed a sexual insult at Kortan."  *Id*.  Here, with the exception of Baxter and Hawkins' comment regarding Mexican women, all of the racial insults were directed at Savage.  The racial commentary also occurred repeatedly over a three month period, as opposed to essentially one isolated

26

instance.  Finally, in *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir. 1990), although plaintiffs alleged employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers and kept illegal personnel files on plaintiffs because they were Latino, the Ninth Circuit affirmed the district court's judgment for employer on plaintiffs' hostile work environment claim. However, *Sanchez* involved review of the district court's directed verdict for defendant employer following a bench trial on plaintiffs' Title VII claims.  The district court determined "no reasonable person could find for plaintiffs" after hearing plaintiffs' evidence, including the existence of conflicting reports finding no racial problems and no basis for many of the allegations made by plaintiffs.  *Id*. at 1031, 1037.  In affirming the district court, the Ninth Circuit did not consider whether plaintiffs' allegations, if true, would have constituted a hostile work environment.  Instead the Court held only, "[w]e cannot say that the district court's ultimate conclusion, that the plaintiffs failed to prove the existence of a discriminatory atmosphere, is incorrect as a matter of law."  *Id*. at 1037. *Sanchez's* relevance to this case is limited because the Ninth Circuit didn't address whether the conduct as plaintiffs' alleged would constitute a hostile work environment.

In sum, when viewing all the facts in the record, the Court finds there is sufficient evidence to create a genuine issue of material fact as to the severity and pervasiveness of the racial conduct towards Savage.  In evaluating motions for summary judgment in the context of employment discrimination, the Ninth Circuit has emphasized the "importance of zealously guarding an employee's right to a full trial, since discrimination claims are

frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest*, 360 F.3d at 1112 (citations omitted). Whether the trier of fact will ultimately find Savage's work environment was objectively hostile is unknown. At this stage, it is sufficient that the factual issues regarding severity could be reasonably resolved in Savage's favor to deny Defendants' motion for summary judgment.[14]

### b. Remedial measures

Having determined genuine issues of material fact preclude summary judgment for either party with respect to whether Savage's work environment was objectively hostile, the Court must decide whether Dennis Dillon is entitled to summary judgment on the issue of its liability for the racial harassment perpetrated by Humlen, Baxter and Hawkins. The relevant standards and burdens pertaining to employer liability vary with the circumstances. *Nichols*, 256 F.3d at 875. Where, as here, harassment by co-workers is at issue, the employer's conduct is reviewed for negligence.[15] *Id*.

Under the negligence standard, an employer is liable for a co-worker's harassment under Title VII only if, after the employer learns of the alleged conduct, it fails to take

---

[14] This holding also applies to Savage's IHRA claim, as a hostile work environment under the IHRA is, like under Title VII, one that is both "subjectively and objectively perceived as hostile based on the totality of the circumstances." *Jeremiah v. Yanke Mach. Shop, Inc.*, 953 P.2d 992, 998 (Idaho 1998). Savage's IHRA claim accordingly survives summary judgment.

[15] When harassment by a supervisor is instead at issue, an employee is vicariously liable, subject to potential affirmative defenses. *Id*. (citing *Faragher*, 524 U.S. at 780).

adequate remedial actions.  *Yamaguchi v. United States Dept. of the Air Force*, 109 F.3d 1475, 1483 (9th Cir. 1997).  Remedies for harassment must be "reasonably calculated to end the harassment."  *Ellison*, 924 F.2d at 882 (quoting *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983)).  The reasonableness of the remedy depends upon its ability to: (1) "stop harassment by the person who engaged in the harassment;" and (2) "persuade potential harassers to refrain from unlawful conduct."  *Ellison*, 924 F.2d at 882.   "When the employer undertakes no remedy, or where the remedy does not end the current harassment and deter future harassment, liability attaches for both the past harassment and any future harassment."  *Nichols*, 256 F.3d at 875-76 (citing *Fuller v. City of Oakland*, 47 F.3d 1522, 1528-29 (9th Cir. 1995)).

To be adequate, an employer must intervene promptly.  *Dawson v. Entek Int'l*, 630 F.3d 928, 940 (9th Cir. 2011).  Further, an employer must take at least some form of disciplinary action against a harassing co-worker in order to prevent workplace harassment.  *Yamaguchi*, 109 F.3d at 1483 (9th Cir. 1997); *Ellison*, 924 F.2d at 882 ("Title VII requires more than a mere request to refrain from discriminatory conduct. Employers send the wrong message to potential harassers when they do not discipline employees for…harassment" and "[f]ailing to take even the mildest form of disciplinary action" renders a remedy "insufficient under Title VII.").

Here, with the exception of the comment regarding Mexican women, Dennis

Dillon had notice of each of the racial insults directed at Savage.[16]   Dennis Dillon also

took several remedial actions.  First, Dennis Dillon investigated the "spook" and

"mammy" comments, held meetings with both Savage and Humlen, and gave Humlen "a

verbal reprimand" for the "spook" comment.  (Dkt. 21, *Erickson Affidavit*, ¶ 2.)

However, neither Erickson's affidavit nor any of the evidence submitted by Defendants

in support of summary judgment identify whether Humlen was reprimanded or in any

way disciplined for the "mammy" comment.  Nor does Dennis Dillon's evidence detail

the extent of the "verbal reprimand" Humlen received.  In the absence of such

information, the Court cannot determine whether Humlen's "verbal reprimand"

constituted actual discipline or was simply a mere request to refrain from discriminatory

conduct.  If the latter, liability would attach for failure to take remedial action with

respect to Humlen. *Ellison*, 924 F.2d at 882.

Dennis Dillon took much more significant action with respect to Baxter and

Hawkins, both writing up and giving each a one-day suspension.  (Dkt. 19-1, ¶ 8.)

Dennis Dillon also conducted an anti-discrimination training on January 18, 2012

following Savage's reports regarding the December comments from Humlen, and early

January comments from Baxter and Hawkins.  (*Id.*, ¶ 9.)  Although Dennis Dillon

---

[16] Savage and others reported the race-based conduct by Humlen, Baxter and
Hawkins to Dennis Dillon's managerial staff on numerous occasions.  (Dkt 22-4, ¶¶ 9,
16, 19, 20, 28, 29.)  Hall also reported Humlen's off-campus statements to both Booher
and Sessions.  (Dkt. 22-2, *Commission Report*, p. 21.).

investigated Humlen's purported comments to Hall and Hazlett, it did not discipline Humlen or take any other remedial actions in response. (Dkt. 21, *Sessions Affidavit*, ¶ 10; Dkt. 19-1, ¶ 13; Dkt. 22-4, ¶¶ 19-20, 30; Dkt. 20, p. 10.)

While Dennis Dillon took some action by disciplining Baxter and Hawkins, giving Humlen a "verbal reprimand" and holding and anti-discrimination training, Savage has presented sufficient evidence to establish disputed issues of material fact with regard to the adequacy of the remedial measures taken by Dennis Dillon.  In fact, if material facts are resolved in favor of Savage, Dennis Dillon would be unable to avoid liability through its remedial measures.

First, Dennis Dillon only responded to one of Humlen's comments, despite having knowledge of numerous other comments.  "Inaction constitutes a ratification of past harassment, even if such harassment independently ceases."  *McGinest*, 360 F.3d at 1120 (citing *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995)).   Second, although it took some steps, the harassment by Humlen did not end after his verbal reprimand. *Ellison*, 924 F.2d at 882 ("An employer's remedy should persuade individual harassers to discontinue unlawful conduct.").  Moreover, the fact that the harassment by Baxter and Hawkins stopped after they were written up and received a one-day suspension underscores the insufficiency of the measures Dennis Dillon took with respect to Humlen.  *Id*. ("In essence, then, we think that the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment.")  Finally, the reactions of Dennis Dillon upon learning about Humlen's comments to Hazlett and Hall indicate the incidents were not taken seriously.  Although

31

Hall was worried enough about Humlen's threats to Savage's safety to notify both Booher and Sessions, Sessions did not investigate further once Humlen denied making the comments.  Dennis Dillon's willingness to accept Humlen's potentially self-serving denial over the reports of both Savage and Hall suggests they did not adequately investigate or take remedial steps to end Humlen's harassment.  Thus, Savage survives summary judgment with respect to Dennis Dillon's liability for Humlen's comments.

      *c.  Statute of Limitations*

      Defendants also argue Savage's emotional distress claims are barred by the statute of limitations.  Specifically, Idaho Code § 5-219 provides a two-year statute of limitation for bringing a claim for personal injury.  Defendants contend Savage's claims rest on a number of discrete actions between the period of December 2011 and March 17, 2012, and that Savage's March 28, 2014 suit was filed beyond the limitations period.  Savage suggests Defendants' misconduct was a continuing tort, and that, under the continuing tort doctrine, claims for emotional distress accrue when the alleged misconduct ends.  Savage argues Defendants' misconduct did not cease until he resigned from employment on May 5, 2012, and states his emotional distress claims is based, in part, on Dennis Dillon's failure to take appropriate corrective action following the March 13, 2012 incident in which Savage was advised by Hazlett that Humlen had referred to Savage as a "nigger" while at work.  (*Id.*, p. 14.)  Further, Savage filed an action in Idaho state court on December 13, 2013 to meet the statute of limitations against the individual defendants because he had not yet received a notice of right to sue from either the IHRC or the EEOC.  Savage filed the instant action on March 28, 2013 after receiving those notices.

(*Id.*, p. 15.)  Defendants respond that even if the misconduct alleged could be considered a continuing tort, the conduct ended on March 17, 2012, the date Savage met with Dennis Dillon management about Hazlett's interaction with Humlen.

Where, as is often the case with claims of intentional or negligent infliction of emotional distress, a tort involves "continuing injury," the cause of action accrues, and the limitation period begins, at the time the tortious conduct ceases. *Curtis v. Firth*, 850 P.2d 749, 754 (Idaho 1992).  This is because, generally, "no single incident in a continuous chain of tortious activity can 'fairly or realistically be identified as the cause of significant harm.'" *Id.* (quoting *Page v. United States*, 729 F.2d 818, 821-22 (D.C. Cir. 1984)).  It thus "seems proper to regard the cumulative effect of the conduct as actionable." *Id.*  Savage testified that he suffered significant emotional distress as a result of both the harassment he suffered, and Dennis Dillon's failure to correct it.  (Dkt. 23, *Savage Deposition*, pp. 35-37; 42-44; 55-57; 166-67; 175-76.)

. Humlen's final act of harassment did not occur until March 13, 2012, and Savage notified Dennis Dillon of this harassment on March 17, 2012.  It is reasonable to assume Savage did not know how or whether Dennis Dillon would respond to the final instance of Humlen's harassment until after March 28, 2012, the relevant date for purposes of the two-year statute of limitations.  It is "well established that a party asserting the affirmative defense of statute of limitations has the burden of establishing the applicability of the statute." *Curtis,* 850 P.2d at 752.  However. Defendants do not identify the date Dennis Dillon determined no action was necessary or whether Dennis Dillon notified Savage that no further action would be taken. *See, e.g.,* Dkt. 19-1, ¶ 13.

Regardless, Savage resigned on May 5, 2012, once it became clear Dennis Dillon would not take any corrective action.   The Court finds Savage's emotional distress claim is not barred by the two-year statute of limitations.

    *d.  Intentional Interference Claims*

    1.   **Intentional Interference with Contractual Relationship**

Savage's intentional interference with contract claim is only brought against Humlen.[17]  A "prima facie case of the tort of interference with contract requires the plaintiff to prove: (a) the existence of a contract; (b) knowledge of the contract on the part of the defendant; (c) intentional interference *causing a breach of the contract*; (2) injury to the plaintiff *resulting from the breach*."  *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 858 (Idaho 1991) (citation omitted) (emphasis in original).  Here, Savage was subject to at-will employment; either Savage or Dennis Dillon could terminate Savage's employment at any time.  Thus, Humlen's conduct did not cause a *breach* of contract, a required element of the tort, as Savage's employment agreement was not breached by either party.  Savage's intentional interference with contract claim fails as a matter of law. *Id.* at 861; *see also Zoellner v. St. Luke's Regional Medical Center*, 937 F.Supp.2d 1261, 1269 (D. Idaho 2013) (Idaho law does not recognize a claim for tortious interference with contractual relations where plaintiff alleges contractual interference with an at-will employees).

---

[17] The claim was originally also brought against Baxter and Hawkins, but both have since been dismissed from the suit.

2. **Intentional Interference with Prospective Economic Advantage**

The elements of intentional interference with a prospective economic advantage are: (1) the existence of a valid economic expectancy; (2) knowledge of the expectancy on the part of the interferer; (3) intentional interference inducing termination of the expectancy; (4) the interference was wrongful by some measure beyond the fact of the interference itself (i.e., that the defendant interfered for an improper purpose or improper means) and (5) resulting damage to the plaintiff whose expectancy has been disrupted. *Highland Enterprises, Inc. v. Barker*, 986 P.2d 996, 1004 (Idaho 1999) (citations omitted).

Savage brings his intentional interference with prospective economic advantage claim against both Dennis Dillon and Humlen.  Dennis Dillon is not liable because a party to a relationship cannot be held liable for tortious interference with that relationship.  *Cantwell v. City of Boise*, 191 P.3d 205, 216 (Idaho 2008).  Further, the acts of a corporation's agents are the acts of the corporation, unless the agent acted outside the scope of his/her duty.  *Id*. (citing *Ostrander v. Farm Bureau Mut. Ins. Co. of Idaho*, 851 P.2d 946, 950 (Idaho 1993)).  Savage alleges Humlen acted outside the course of his authority for Dennis Dillon in harassing Savage, and that Humlen is therefore a third party to the relationship between Dennis Dillon and Savage.  However, Savage has not cited any authority to suggest either that an employee acting outside his employment authority may interfere with continuation of a prospective at-will employment relationship, or that a third party can be liable for interference with a prospective economic advantage where, as here, the plaintiff terminates the relationship.  *See, e.g.,*

35

*Scelta v. Delicatessen Support Serv., Inc.*, 57 F.Supp. 2d 1327 (M.D. Fla. 1999) (applying Florida law) (allegations in former employee's complaint that she was forced to resign due to former supervisor's harassment causing a hostile work environment did not state a claim for interference with prospective economic advantage because manager was not third party to the employment relationship and plaintiff was at-will).  Savage's intentional interference with a prospective economic advantage claim fails as a matter of law.

  *e.  Affirmative Defenses*

  Savage requests that the Court dismiss eleven of Defendants' affirmative defenses. With the exception of the hostile work environment and statute of limitations defenses discussed above,[18] it is unclear at this stage of the litigation whether Defendants will attempt to proceed on the defenses Savage seeks to dismiss.  The Court will reserve ruling on Defendants' affirmative defenses until trial.

**ORDER**

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

  1. Savage's Motion for Partial Summary Judgment is **DENIED IN PART AND GRANTED IN PART**.  Summary Judgment is **GRANTED** with respect to

---

[18] Defendants Ninth Affirmative Defense states: "The alleged conduct of the Defendants was not so severe, pervasive, or otherwise lacked the elements so as to constitute an illegal and tortious hostile work environment."  (Dkt. 17, p. 10.)  As the Court has determined the existence of an objectively hostile work environment is an issue for the jury, it will not here dismiss Defendants' Ninth Affirmative Defense.  Defendants' Thirteenth Affirmative Defense raises the statute of limitations issue with respect to Savage's emotional distress claims.  As previously discussed, the Court finds Savage filed his complaint within the two-year limitations period.  Defendants' Thirteenth Affirmative Defense is dismissed.

the statute of limitations for Savage's emotional distress claims.  The Court finds Savage filed this suit within the two-year limitations period.  Summary Judgment is **DENIED** with respect to Dennis Dillon's liability under Title VII and the IHRA.  Summary judgment is **DENIED** without prejudice with respect to Defendant's Third, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and Fourteenth Affirmative defenses.

2. Defendants' Motion for Summary Judgment is **DENIED IN PART AND GRANTED IN PART**.  Summary Judgment is **GRANTED** with respect to Savage's intentional interference claims.  Summary Judgment is **DENIED** with respect to Savage's hostile work environment and IHRA claims.

3. If the parties desire to pursue mediation, they shall do so within sixty (60) days of the date of this Order.[19]  If the parties do not intend to mediate or mediation fails, they shall contact the Court for a trial setting.

DATED: January 25, 2016

Edward J. Lodge
United States District Judge

_____

[19] The parties shall contact the Court if they need additional time to complete mediation.